# 24-2512

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

INDUSTRIAL TOWER AND WIRELESS, LLC,

*Plaintiff-Appellant,*

—against—

ANTHONY Z. ROISMAN, as a member of the State of Vermont Public Utility Commission, MARGARET CHENEY, as a member of the State of Vermont Public Utility Commission, RILEY ALLEN, as a member of the State of Vermont Public Utility Commission,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT
NO. 2:23-CV-00365-GWC (HON. GEOFFREY W. CRAWFORD)

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

DANIEL A. SEFF
MSK ATTORNEYS
275 College Street
Burlington, Vermont 05401
(802) 861-7000

*Attorneys for Plaintiff-Appellant*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... iii

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................2

STATEMENT OF THE CASE ....................................................................3

    A.    Nature of the Case...................................................................3

    B.    Relevant Procedural History ..................................................5

    C.    Disposition Below.................................................................6

    D.    Statement of Relevant Facts....................................................6

        1.    Tower Site Location .......................................................6

        2.    Evidence Presented in the PUC Proceedings ...........................10

SUMMARY OF THE ARGUMENT ...........................................................13

ARGUMENT ......................................................................................16

    A.    The PUC Denial Order Effectively Prohibits PWS ...........................19

        1.    Effective Prohibition Claims are Assessed
             Carrier-by-Carrier ....................................................20

        2.    The "Least Intrusive Means" Test Does Not
             Mean that State and Local Siting Criteria are
             All that Matters........................................................27

        3.    Effective Prohibition Claims are Heard De
             Novo, Intrusiveness is a Fact Question, and
             There was No Evidence to Find that the 140-
             Foot Tower is Intrusive .............................................31

B.     The PUC Denial Order Violated the TCA's Substantial Evidence Clause ................................................ 36

    1.     While the Regional Plan Requires a Proposed Telecommunications Facility to be the "Least Obtrusive System Possible," it Also Expresses a Preference for Co-Location, as Does State Statutory Law .................................... 36

    2.     The PUC Denial Order Lacks Substantial Evidence .................................................................. 39

C.     Providing "Substantial Deference" to the NRPC Letter Violated the TCA's Substantial Evidence Clause ..................................................................... 42

CONCLUSION .............................................................................. 45

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ....................................................................... 46

## TABLE OF AUTHORITIES

## CASES

360 Degrees Commc'ns Co. v. Bd. of Supervisors, 211 F.3d 79
(4th Cir. 2000) ..................................................................................28

Am. Tower Corp. v. City of San Diego, 763 F.3d 1035 (9th Cir.
2014)..................................................................................................29

APT Pittsburgh Ltd. P'ship v. Penn Twp., 196 F.3d 469 (3d Cir.
1999)..............................................................................................29, 32

AT & T Wireless PCS, Inc. v. Town of Porter, 203 F. Supp. 2d
985 (N.D. Ill. 2002) ..........................................................................30

AT&T Mobility Servs., LLC v. Vill. of Corrales, 127 F. Supp.
3d 1169 (D.N.M. 2015, aff'd, 642 F. App'x 886 (10th Cir.
2016)..................................................................................................25

AT&T Mobility Servs., LLC v. Vill. of Corrales, 642 F. App'x
886 (10th Cir. 2016) ................................................................29, 32, 33

Cellco P'ship v. White Deer Twp. Zoning Hearing Bd., 609 F.
Supp. 3d 331 (M.D. Pa. 2022), aff'd, 74 F.4th 96 (3d Cir.
2023)..................................................................................................25

Cellco P'ship v. White Deer Twp. Zoning Hearing Bd., 74 F.4th
96 (3d Cir. 2023) ..........................................................................29, 30

Cellular Phone Task Force v. FCC, 205 F.3d 82 (2d Cir. 2000)..............................27

Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490 (2d Cir.
1999)..............................................................................................17, 39

City of Rancho Palos Verdes v. Abrams, 544 U.S. 113 (2005) ........................16, 17

Crown Castle NG E. Inc. v. Town of Greenburgh, No. 12-CV-
6157 (CS), 2013 WL 3357169 (S.D.N.Y. July 3, 2013), aff'd,
552 F. App'x 47 (2d Cir. 2014) (summary order) ................................24

Green Mt. Realty Corp. v. Leonard, 750 F.3d 30 (1st Cir. 2014) ...............29, 32, 33

Helcher v. Dearborn Cty., 595 F.3d 710 (7th Cir. 2010) .........................................32

Horizon Tower Ltd., LLC v. Park Cty., No. 2:23-CV-37-ABJ,
    2024 WL 4525229 (D. Wyo. Oct. 4, 2024), appeal docketed,
    No. 24-8069 (10th Cir. Oct. 9, 2024) ....................................................................29

In re Morrisville Hydroelectric Project Water Quality, 2019 VT
    84, 211 Vt. 233, 224 A.3d 473 ...............................................................................44

Independent Wireless One Corp. v. Town of Charlotte, 242 F.
    Supp. 2d 409 (D. Vt. 2003) .....................................................................................24

Indus. Tower & Wireless, LLC v. Haddad, 109 F. Supp. 3d 284
    (D. Mass. 2015) .......................................................................................................37

Indus. Tower & Wireless, LLC v. Roisman, No. 2:23-CV-365,
    2024 WL 4329935 (D. Vt. Aug. 19, 2024)................................................................8

Kohler v. Astrue, 546 F.3d 260 (2d Cir. 2008) .........................................................41

Linza v. Saul, 990 F.3d 243 (2d Cir. 2021)................................................................21

Los Angeles SMSA Ltd. P'ship v. City of Los Angeles, No.
    2:16-cv-04954-FLA (SKX), 2021 WL 3741539 (C.D. Cal.
    Aug. 24, 2021)..........................................................................................................32

MetroPCS, Inc. v. City and Cty. of San Francisco, 400 F.3d 715
    (9th Cir. 2005), abrogated by T-Mobile S., LLC v. City of
    Roswell, 574 U.S. 293 (2015) ..................................................................................25

N.Y. SMSA Ltd. P'ship v. Town of Clarkstown, 603 F. Supp. 2d
    715 (S.D.N.Y 2009).................................................................................................23

Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d
    14 (1st Cir. 2002).....................................................................................................33

New Cingular Wireless PCS, LLC v. Conn. Siting Council, No.
    11cv1502 (WWE), 2012 U.S. Dist. LEXIS 116893 (D. Conn.
    Aug. 12, 2012)..........................................................................................................32

New Cingular Wireless PCS, LLC v. Town of Fenton, 843 F.
  Supp. 2d 236 (N.D.N.Y. 2012) ..........................................................41, 43

New York SMSA L.P. v. Town of Oyster Bay Zoning Bd. of
  Appeals, No. 08-CV-4833 JS AKT, 2010 WL 3937277
  (E.D.N.Y. Sept. 30, 2010)....................................................................41

New York SMSA Ltd. P'ship v. Inc. Vill. of Mineola, No. 01-
  CV-8211(JS)(WDW), 2003 WL 25787525 (E.D.N.Y. Mar. 26,
  2003)....................................................................................................40

Nextel Partners of Upstate N.Y., Inc. v. Town of Canaan, 62 F.
  Supp. 2d 691 (N.D.N.Y. 1999) .............................................................30

Nextel Partners, Inc. v. Town of Amherst, 251 F. Supp. 2d 1187
  (W.D.N.Y. 2003)...................................................................................30

Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d
  529 (2d Cir. 2005) ...................................................................22, 27, 31

Omnipoint Commc'ns, Inc. v. Town of LaGrange, 658 F. Supp.
  2d 539 (S.D.N.Y. 2009).........................................................................30

Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38 (1st
  Cir. 2009)..................................................................................28, 29, 30

Orange Cty.-Poughkeepsie L.P. v. Town of E. Fishkill, 632 F.
  App'x 1 (2d Cir. 2015) (summary order) ..................................19, 29, 35

PI Telecom Infrastructure, LLC v. City of Jacksonville, 104 F.
  Supp. 3d 1321 (M.D. Fla. 2015) ...........................................................32

Primeco Pers. Commc'ns v. City of Mequon, 242 F. Supp. 2d
  567 (E.D. Wis. 2003), aff'd, 352 F.3d 1147 (7th Cir. 2003) ................30

Schwebel v. Crandall, 967 F.3d 96 (2d Cir. 2020)...........................18, 34

Second Generation Props., L.P. v. Town of Pelham, 313 F.3d
  620 (1st Cir. 2002)....................................................................25, 30, 31

Southwestern Bell Mobile Sys., Inc. v. Todd, 244 F.3d 51 (1st Cir. 2001)......................................................................................37

Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630 (2d Cir. 1999)....................... passim

TCG N.Y., Inc. v. City of White Plains, 305 F.3d 67 (2d Cir. 2002).................................................................................22, 23

T-Mobile Central, LLC v. Unified Gov't of Wyandotte Cty., 546 F.3d 1299 (10th Cir. 2008) ........................................36, 37, 38

T-Mobile Ne. LLC v. Fairfax Cty. Bd. of Supervisors, 672 F.3d 259 (4th Cir. 2012) .............................................................28

T-Mobile Ne. LLC v. Loudoun Cty. Bd. of Supervisors, 748 F.3d 185 (4th Cir. 2014) ............................................................32

T-Mobile Ne. LLC v. Town of Ramapo, 701 F. Supp. 2d 446 (S.D.N.Y. 2009)..................................................................24, 30

T-Mobile S., LLC v. City of Roswell, 574 U.S. 293 (2015) ............................36, 39

T-Mobile S., LLC v. City of Roswell, No. 1:10-CV-1464-AT, 2016 WL 11745937 (N.D. Ga. Oct. 7, 2016) ........................................33

TowerNorth Dev., LLC v. City of Geneva, No. 22 C 4151, 2024 WL 621616 (N.D. Ill. Feb. 14, 2024)...................................................30

Town of Amherst v. Omnipoint Commc'ns Enters., Inc., 173 F.3d 9 (1st Cir. 1999).........................................18, 30, 36, 37

Up State Tower Co, LLC v. Vill. of Lakewood, 431 F. Supp. 3d 157 (W.D.N.Y. 2020)...............................................................24, 42

Up State Tower Co., LLC v. Town of Kiantone, No. 1:16-CV-00069-MAT, 2019 WL 1117220 (W.D.N.Y. Mar. 11, 2019), adhered to on denial of reconsideration, 2019 WL 6320335 (W.D.N.Y. Nov. 26, 2019), aff'd, 820 F. App'x 75 (2d Cir. 2020) (summary order)............................................................40

Up State Tower Co., LLC v. Town of Tonawanda, No. 1:18-CV-
   00952 LJV(MJR), 2020 WL 8083693 (W.D.N.Y. Nov. 18,
   2020, rep. and rec. adopted, 2021 WL 50906 (W.D.N.Y. Jan.
   6, 2021)..................................................................................40, 43

USCOC of Greater Iowa, Inc. v. Zoning Bd. of Adjustment, 465
   F.3d 817 (8th Cir. 2006) ......................................................28, 30

VoiceStream Minneapolis, Inc. v. St. Croix Cty., 342 F.3d 818
   (7th Cir. 2003) .....................................................................28, 29

## **STATUTES**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

30 V.S.A. § 202c(b)(9)......................................................................38

30 V.S.A. § 248a(b)(5)...........................................................2, 44, 45

47 U.S.C. § 253 ...............................................................................22

47 U.S.C. § 253(a)......................................................................22, 23

47 U.S.C. § 332(1).............................................................................4

47 U.S.C. § 332(c)(7) ................................................................. passim

47 U.S.C. § 332(c)(7)(B)(i)(I)..........................................................22

47 U.S.C. § 332(c)(7)(B)(iii) .....................................................41, 42

## **OTHER AUTHORITIES**

Cal. Payphone Ass'n, 12 FCC Rcd. 14191 (1997)............................22, 23

In the Matter of Petition for Declaratory Ruling to Clarify
   Provisions of Section 332(c)(7)(b), 24 F.C.C. Rcd. 13994
   (Nov. 18, 2009)....................................................................23, 25

## I.   **JURISDICTIONAL STATEMENT**

This appeal of the Plaintiff-Appellant, Industrial Tower and Wireless, LLC ("ITW") seeks review under § 704 of the Telecommunications Act of 1996, as codified at 47 U.S.C. § 332(c)(7) ("TCA"), for expedited hearing and relief, declaratory judgment and injunctive relief to set aside the August 3, 2023 Order Denying Certificate of Public Good ("PUC Denial Order" or "Denial Order") issued by Defendants-Appellees, the members of the Vermont Public Utility Commission ("PUC") (Joint Appendix ("Appx") 748-760).  ITW is seeking a certificate of public good "(CPG") for installation of a wireless telecommunications facility, including a 140-foot lattice tower, in Enosburgh, Vermont.

This appeal follows from the District Court's August 19, 2024 summary judgment Opinion and Order (the "MSJ Decision") (Special Appendix ("SPA") 001-038) and Judgment entered August 21, 2024 (SPA 39) that resolved all parties' claims in favor of Defendants-Appellees.  ITW filed its Notice of Appeal on September 18, 2024 (Appx976-977).  The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  The Court of Appeals has jurisdiction pursuant to 28 U.S.C. § 1291 to review the District Court's final decision.

## II.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.  Whether the PUC's Denial Order effectively prohibits personal wireless service.

  a.  Whether effective prohibition claims under the TCA are assessed on a carrier-by-carrier basis.

  b.  Whether the "least intrusive means" test concerns itself with more than the aesthetic siting criteria of state and local law, such as whether personal wireless service has, in fact, been effectively prohibited.

  c.  Whether effective prohibition claims are heard de novo, whether district courts are to give deference to state and local administrative factual findings, and whether principles of Federal Rule of Civil Procedure 56 apply.

2.  Whether the PUC Denial Order violates the TCA's substantial evidence clause.

  a.  Whether the PUC Denial Order rationally applied the legal standards set forth in Vermont statutory law and the applicable regional plan.

  b.   Whether the PUC's determination that ITW's proposed tower is not the "least obtrusive system possible" to provide needed personal wireless service was supported by substantial evidence in the administrative record.

  c.  Whether the PUC's giving of "substantial deference" (as defined in 30 V.S.A. § 248a(b)(5)) to a regional planning commission's conclusory advisory opinion that was devoid of substantial evidence violates the TCA, and whether the TCA preempts 30 V.S.A. § 248a(b)(5) as applied in this case.

## III.   STATEMENT OF THE CASE

### A.   Nature of the Case.

ITW is one of a series of interrelated entities (Appx096-097).[1]  ITW is Industrial's site acquisition, development and tower site leasing business (Appx097). ITW constructs, owns and operates wireless service facilities, including towers, transmitters and antennas for itself and other personal wireless service ("PWS") providers (Appx097-104).  These facilities are constructed with the intent to lease space to T-Mobile, Verizon, AT&T and Dish Wireless (collectively, the "National Carriers") as "co-location" sites to reduce tower proliferation and expand wireless services (Appx100-104).  To do so, ITW identifies gaps in coverage for the National Carriers, as well as sites to develop facilities to fill such gaps, applies for permits and constructs facilities on such permitted sites (Appx097-105).

ITW's facilities also provide the critical infrastructure necessary to support ITW's own 900 MHz trunked digital commercial mobile radio service network, as well as for federal, state and local public safety communications systems, third-party PWS network coverage (including for the National Carriers), wireless broadband and internet services, microwave backhaul, radio and TV broadcast (Appx097-105).

---

[1] In addition to ITW, these entities are Industrial Communications, LLC; Industrial Communications & Electronics, Inc.; and Industrial Wireless Technologies, Inc. (collectively referred to as "Industrial"), which own and operate ± 150 tower facilities in New England, as well as sites in Florida, Colorado and Nebraska (Appx097).

ITW is a Specialized Mobile Radio licensee, providing a variety of land mobile communications services in New England (Appx103). ITW is considered a PWS provider <u>per</u> the TCA, 47 U.S.C. § 332(1) (Appx099).

ITW identified one such significant gap in PWS within a ±10-mile radius in Franklin County, Vermont, that includes Route 108 and extends north towards Chester A. Arthur Road and St. Pierre Road and, to the south, County Road, Ovitt Road, Pudvah Hill Road, Pond Road and Boston Post Road, encompassing parts of the Towns of Enosburgh and Bakersfield (the "Coverage Gap") (Appx104-126). To fill the Coverage Gap, and after conducting extensive radio frequency ("RF") propagation studies to identify the most suitable location, ITW proposed constructing a 140-foot telecommunications tower (the "Tower") with an 80-foot by 80-foot fenced compound, and equipment (the "Tower Project") on a portion of the ±506-acre parcel off of Bordoville Road in Enosburgh, Vermont (the "Tower Site").

The Tower Project is intended to fill the Coverage Gap for ITW and the National Carriers as well as providing public service communications for the St. Albans Police Department (the "Police Department") (Appx104-126). A Tower height of 140 feet is essential to co-locate each of the National Carriers' services— a height less than 140 feet would not yield adequate space for co-location of all National Carriers and would not fill the coverage gaps of each (Appx104-126).

While acknowledging the State of Vermont's goal to provide universal access to PWS within its jurisdiction, the PUC denied ITW's petition "because the [Tower] Project does not comply with the recommendations of the [Northwest Regional] Planning Commission regarding the Regional Plan and therefore does not qualify for a CPG under 30 V.S.A. § 248a(c)(2)" (Appx748-760).

ITW brought this appeal because the PUC Denial Order violates the TCA in multiple respects.

### B.   <u>Relevant Procedural History.</u>

On March 4, 2022, ITW filed a 60-day notice of intention to file an application with the PUC (Appx162-170).  On June 8, 2022, ITW filed its application with the PUC for a CPG (Appx172-351). Included in ITW's application was the expert affidavit, pre-filed testimony, and technical report of Louis Hodgetts, P.E., a professional engineer from DuBois & King, Inc., in South Burlington, Vermont ("Hodgetts") (Appx214-283), and pre-filed testimony of Kevin Delaney, ITW's Vice President of Site Acquisition and Development ("Delaney") (Appx284-351).  On June 10, 2022, the PUC determined that ITW's application was "administratively complete" (Appx378-380).

Throughout July 2022, property owners and governmental entities provided comments on ITW's application. (Appx382-404). In particular, the Northwest Regional Planning Commission ("NRPC") submitted a letter dated July 26, 2022

(the "NRPC Letter") (Appx694-696) relaying the opinions and conclusions of its "Project Review Committee." In that Letter, the NRPC conceded that the Project would not have a substantial regional impact but nevertheless recommended that ITW's application be denied because "the [Tower] is not the 'least obstructive [sic] system possible' and will create a greater aesthetic impact on the character of the area than is necessary to provide the applicant's service" (Appx695). ITW filed and served its response, which included Delaney's supplemental pre-filed testimony (Appx353, 388). In December 2022, Gordon Perkins ("Perkins"), the independent expert retained by the Vermont Department of Public Service ("DPS"), issued a report ("Aesthetics Report") concluding that the Tower's visual impacts would be insubstantial (Appx442, 460-462, 469, 474). The DPS represents the public interest in proceedings before the PUC.

On January 12, 2023, the PUC's hearing officer (the "Hearing Officer") conducted a merits hearing (the "Merits Hearing") (Appx512-661). On March 1, 2023, the Hearing Officer issued a Proposal for Decision recommending PUC approval of the Tower Project (Appx663).

On March 30, 2023, however, the PUC sua sponte issued an Order Requesting Clarification from the NRPC concerning comments previously submitted via the NRPC Letter that were deemed "not consistent" and could not be clarified at the Merits Hearing, as the NRPC had not participated (Appx681). Further, on April 24,

2023, the PUC issued a Notice of Hearing for oral argument to take place on May 4, 2023 (Appx686).

On April 28, 2023, the NRPC submitted further comments, reiterating that the Tower Project should not be approved (Appx701-702) and, that same day, the PUC cancelled the May 4, 2023 hearing (Appx706). On May 3, 2024, the PUC reopened the evidentiary record and remanded the case to the Hearing Officer (Appx710-711).

On July 6, 2023, the Hearing Officer issued a Revised Proposal for Decision recommending that the PUC deny the Tower Project (Appx731-739).

On August 3, 2023, the PUC issued its Denial Order, refusing to issue the CPG (Appx748-760).

ITW challenged the PUC Denial Order in a federal lawsuit against the three PUC Commissioners that commenced on August 31, 2023 (Appx001-002). ITW filed its Amended Complaint on November 2, 2023 (Appx006-031). Defendants filed an Amended Motion to Dismiss on December 1, 2023 (Appx032-048). ITW opposed the Amended Motion to Dismiss on January 19, 2024 (Appx049-066). ITW then moved for summary judgment on February 2, 2024 (Appx077-760).

On April 5, 2024, Defendants filed their Opposition to ITW's Motion for Summary Judgment (Appx780-803). On May 24, 2024, the District Court held a hearing on the parties' respective dispositive Motions (Appx936-975). At the hearing, the District Judge converted Defendants' Amended Motion to Dismiss into

a Rule 56 summary judgment Motion and gave Defendants two weeks to file additional motion papers (Appx004, 939-940). Defendants did not file additional papers (Appx004).

### C. **Disposition Below.**

On August 19, 2024, the District Court denied ITW's Motion for Summary Judgment and granted Defendants' converted Motion for summary judgment (SPA 01-38). Judgment entered on August 21, 2024 (SPA 39). See Indus. Tower & Wireless, LLC v. Roisman, No. 2:23-CV-365, 2024 WL 4329935 (D. Vt. Aug. 19, 2024).

### D. **Statement of Relevant Facts.**

### 1. **Tower Site Selection.**

The proposed Tower Site is in Enosburgh, Vermont, a rural town (Appx179). Enosburgh's population is ±2,500 residents (Appx011). Additionally, Vermont Agency of Transportation data indicates that the annual average daily traffic count along state highway Route 108 was approximately 1,388 vehicle trips per day in 2022. The Route 108 highway, where a large section of the Coverage Gap is concentrated, is a narrow and winding roadway running between intervening mountainous terrain (Appx182). This topography creates severe difficulties for signal propagation because PWS is a line-of-sight technology, which requires radio signals to pass between towers and end-users' cell phones and/or mobile radios

(Appx287). The more physical obstacles between towers and end users, such as vegetation and mountainous terrain, the greater the reduction in efficient PWS (id.).

Immediately after identifying the Coverage Gap, ITW undertook an extensive review process to determine the most suitable location to construct a tower to provide PWS (Appx104-126). Of the nine potential sites ITW assessed, eight proved unfeasible because they would not fill the Coverage Gap or because the properties were not available to host a tower (Appx108-109). ITW further explored co-locating its facility on an existing telecommunications structure, but the only two existing towers within the Coverage Gap were too far away or not tall enough to provide the necessary coverage for the National Carriers and ITW (id.). Therefore, the final and remaining Tower Site is the only viable means of filling the Coverage Gap for ITW and the National Carriers (Appx107-126).

Given the location, terrain, tree cover and number of users, 140 feet of Tower height is the minimum necessary to provide the required space for the four National Carriers to co-locate and fill the Coverage Gap for all (Appx104-126).[2] RF propagation decreases precipitously when antenna arrays are installed below an elevation of 100 feet due to intervening terrain and vegetation in the area.

---

[2] ITW's proposed 900 MHz system antennas would be mounted at 140 feet (Appx109). ITW's transmit antennas would extend upward to a height of 153 feet and the receive antennas would extend downward to 127 feet (id.). The National Carriers would have mountings at elevation 122.5 feet and downward in 10-foot increments (i.e., 122.5 feet, 112.5 feet, 102.5 feet and 92.5 feet) (id.).

(Appx109). Reducing the Tower to 120 feet would mean only one of the National Carriers could mount antennas above 100 feet (id.), thereby preventing the other National Carriers from filling the Coverage Gap and requiring additional towers to do so (Appx109-110).

National Carriers have deferred committing to co-location on the Tower until ITW obtains its CPG for the Tower Project (Appx110).[3]

The Police Department has committed to co-locating its equipment on the Tower to improve its service in Franklin County, Vermont (Appx355-360). Further, the Police Department expressed its preference to have its antenna mounted at the top of the Tower at the 140-foot level (Appx355-356). ITW agreed to allow this co-location free of any rent obligation (Appx355-360).

## 2. **Evidence Presented in the PUC Proceedings.**

Perkins and Hodgetts supplied the only substantial evidence to the PUC regarding the visibility of ITW's proposed Tower. They each submitted a report and provided live and pre-filed testimony to the Hearing Officer regarding the Tower Project's lack of environmental and visual impacts (Appx214-283, 442-510, 553-609).

---

[3] The National Carriers' choice to defer commitment is consistent with typical trade practice in the industry (Appx100). Generally, the National Carriers will not commit to enter lease contracts without permitting for facilities having already been procured. This is so because the existence of such facilities remains too contingent until permitting is obtained, as this litigation and appeal demonstrate.

Perkins' Aesthetics Report utilized digital surface modeling ("DSM") technology to model the Tower's visibility from within a two-mile radius "visual study area" (the "VSA"), proving that it will not be seen from 96.9% of the VSA and that only its upper half will be visible within 1.4% of the same (Appx442-510). The Aesthetics Report states that "[t]he results of this analysis suggest that [Tower] visibility beyond 1.5-miles is very limited and, therefore, it was concluded that the 2-mile radius conservatively defines the [Tower]'s area of potential effect" (Appx448).

Furthermore, Perkins completed a viewshed analysis of the Tower if it were reduced to 120 feet and concluded that such a height reduction would not materially reduce its visibility, i.e., a 0.6% reduction (Appx470-472). Perkins testified that "the difference was incremental at best. Shortening the Tower to 120 feet "did not substantially reduce the visibility of the tower within the [VSA]. And there were no substantial reductions in the locations where the tower would be visible" (Appx589).

Hodgetts performed a visual balloon test at the Tower Site that confirmed the same lack of visual impacts and corroborated the results of Perkins' Aesthetics Report (Appx222-271, 553-574).

The very limited areas where the Tower is projected to be visible are almost entirely in Rural Valley locations along State Route 108 to the north and east of the proposed Tower, with small, scattered areas in Forest Upland locations (Appx460-

510). The property owners who intervened in the PUC docket live on or near Bordoville Road, away from State Route 108, and would not see any part of the proposed Tower (Appx460-510, 612-646). These property owners did not produce an expert and they failed to refute the Aesthetics Report or Hodgetts and Perkins' expert opinions (Appx460-510, 552-646).

As recited above, on March 1, 2023, after the Merits Hearing, in which the NRPC did not participate, the Hearing Officer recommended that the PUC approve the Tower Project (Appx663-679). Less than a month later, the PUC sua sponte issued an order seeking clarification of the NRPC Letter, which the PUC deemed as "not consistent" (Appx681-684). On April 27, 2023, the PUC scheduled a second merits hearing for May 4, 2023 (Appx690-692). On April 28, 2023, the NRPC submitted a second set of comments essentially reiterating its previous position that a 140-foot Tower would be "unduly obtrusive" (Appx701-702). That same day, the PUC cancelled the second merits hearing without explanation (Appx 706-708).

On May 3, 2023, the PUC remanded the case to the Hearing Officer (Appx710-713). On May 26, 2023, ITW submitted its response to the NRPC's reiterated comments (Appx720-729). Despite the lack of any new evidence and the fact that the NRPC simply repeated the comments it submitted in July 2022 with no supporting evidence (Appx694-696), the Hearing Officer reversed his position and recommended that the PUC deny the Tower Project (Appx731-741).

-12-

On August 3, 2023, based on the Hearing Officer's new recommendation, the PUC issued the Denial Order (Appx748-760). The Denial Order rests solely on the NRPC's unfounded opinion that the proposed Tower would be "unduly obtrusive" (Appx694-696) despite expert opinions to the contrary (Appx460-510, 552-646).

## IV.  **SUMMARY OF THE ARGUMENT**

The PUC Denial Order effectively prohibits the provision of PWS and violates the substantial evidence clause of the TCA. Effective prohibition claims are assessed on a carrier-by-carrier basis. Here, neither the National Carriers nor ITW has PWS in the Coverage Gap. There is no dispute about the Coverage Gap. There is also no dispute that ITW's proposed 140-foot Tower reflects the lowest possible height necessary to fill the Coverage Gap for ITW and the National Carriers. On this basis alone, irrespective of any immaterial difference in visibility between 140 feet and 120 feet, the Tower is the "least intrusive means" to fill the admitted Coverage Gap.

This Court's "least intrusive means" test for the second prong of an effective prohibition claim does not purport, nor is it intended, to elevate a single land-use siting criterion, i.e., aesthetics, above congressional intent. On the contrary, Congress intended to preempt all state and local land-use siting criteria when the literal enforcement of those state and local land-use standards would have the effect of prohibiting PWS. Consistent with this intent, this Court, like its sister Circuits, has instructed district courts to consider a multitude of factors in determining

-13-

whether a proposal reflects the "least intrusive means" to fill a significant gap in coverage. Here, the District Court committed errors of law by conflating aesthetic intrusiveness with any measurable visibility at all, and also by disregarding every other relevant factor to determine whether there has been an effective prohibition of PWS.

Effective prohibition claims are heard de novo, with no deference to state and local siting authorities' factual findings. When a Rule 56 movant comes forward with credible evidence supporting its summary judgment motion, the burden is on the non-movant to offer credible countervailing evidence to create a triable issue. Where, as here, there are summary judgment cross-motions, each motion is evaluated on its own merits, with the court viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. But the District Court discounted and rejected the opinion testimony of ITW's and DPS's experts about the Tower's overall lack of visibility, let alone visual intrusiveness. And the District Court ignored the fact that the PUC provided no countervailing evidence.

Instead, the District Court made its own findings on a fact question to be heard de novo, based on an impermissible inference that any difference in visibility between 140 feet and 120 feet means that the Tower is not the "least intrusive means" to fill the admitted Coverage Gap. On summary judgment, however, a district court is not intended to act as one side's expert witness, ignore properly competent expert

-14-

opinion evidence, make credibility assessments or enter summary judgment for a party that provided zero countervailing evidence.

In sum, the PUC's Denial Order effectively prohibits PWS for ITW and the National Carriers necessary to fill the Coverage Gap for all. As such, the Denial Order should be annulled and an injunction should be entered authorizing ITW to construct the Tower.

The PUC Denial Order also violates the TCA's substantial evidence clause in multiple respects. The substantial evidence clause requires state and local telecommunications siting authorities to apply relevant land-use law rationally, according to the plain meaning of the legal standards contained therein. Here, the Regional Plan required that the Tower be the "least obtrusive system possible" to provide needed PWS, substantially mirroring this Court's "least intrusive means" test. But the same Regional Plan and State statutory law express a preference for co-location. The PUC elevated the Regional Plan's "least obtrusive system possible" standard to the point where Tower invisibility would be required while ignoring the equally operative preference for co-location contained in State statutory law and the Regional Plan.

The PUC had no substantial evidence for its finding that the Tower would be "unduly obtrusive." On the contrary, the only substantial evidence in the closed administrative record was the expert testimony ITW and DPS provided, both of

whose experts testified that the Tower would be barely visible, let alone visually obtrusive.

The only purported contrary "evidence" on which the PUC relied was the factually unsubstantiated NRPC Letter and commentary, neither of which qualify as "substantial evidence" under the TCA. Therefore, to the extent the PUC may have felt legally constrained to give "substantial deference" to the NRPC Letter, the requirements of the TCA's substantial evidence clause preempted Vermont law. TCA substantial evidence review does not countenance a telecommunications siting authority conferring "substantial [evidentiary] deference" on an unfounded opinion.

In sum, this Court should vacate the PUC Denial Order pursuant to the TCA's effective prohibition and substantial evidence clauses and issue a decree pursuant to the TCA authorizing the Tower's construction.

## V.   **ARGUMENT**

The District Court's errors flow from an apparent basic misunderstanding of the TCA and the intent animating the statute. "Congress enacted the Telecommunications Act of 1996 (TCA), 110 Stat. 56, to promote competition and higher quality in American telecommunications services and to 'encourage the rapid deployment of new telecommunications technologies.'" City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115 (2005) (quoting the statute). In Abrams, the Court explained that:

> One of the means by which [Congress] sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers. To this end, the TCA amended the Communications Act of 1934, 48 Stat 1064, to include § 332(c)(7), which imposes specific limitations on the traditional authority of state and local governments to regulate the location, construction, and modification of such facilities, 110 Stat. 151, codified at 47 U.S.C. § 332(c)(7).

Abrams, 544 U.S. at 115-16.

"In furtherance of this goal, Congress enacted 47 U.S.C. § 332(c)(7) which limits the state and local government's authority to deny construction of wireless telecommunications towers, see id. § 332(c)(7)(B)(i), and regulates how such decisions must be made, see id. §§ 332(c)(7)(B)(ii)-(iv)." Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 637 (2d Cir. 1999).

"Although the TCA preserves local zoning authority in all other respects over the siting of wireless facilities, id. § 332(c)(7)(A), 'the method by which siting decisions are made is now subject to judicial oversight. Therefore, denials subject to the TCA are reviewed by this court more closely' than are other types of zoning decisions to which federal courts generally accord great deference." Willoth, 176 F.3d at 637 (quoting Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 493 (2d Cir. 1999)).

-17-

Two such limitations are at issue, here, as the TCA: (1) proscribes state and local regulation that has the effect of prohibiting PWS; and (2) requires that state and local telecommunications siting denial decisions be in writing, and subjects such denial decisions to the classic standard of judicial review of administrative decisions. See Willoth, 176 F.3d at 638. These "two federal limitations—one dealing with bans and the other with substantial evidence—complement one another by ensuring that local law is both fair and is fairly administered" to further congressional intent to facilitate the rapid deployment of telecommunications infrastructure while maintaining a residuum of state and local siting authority. Town of Amherst v. Omnipoint Commc'ns Enters., Inc., 173 F.3d 9, 16 (1st Cir. 1999).

ITW maintains that the PUC Denial Order and the District Court's MSJ Decision violate the TCA's effective prohibition and substantial evidence clauses.

As the District Court acted on cross-motions for summary judgment, the standard of review is de novo, "in each case construing the evidence in the light most favorable to the non-moving party." Schwebel v. Crandall, 967 F.3d 96, 102 (2d Cir. 2020).

In ruling for the PUC Defendants rather than ITW, the District Court committed a series of reversible legal errors. Essentially, the District Court made factual findings with respect to expert evidence in a closed administrative record contrary to the opinions of the relevant experts. Vermont will continue to lack

adequate PWS, and deny the provision of PWS against congressional intent, if the TCA is not properly enforced. This Court should grant ITW's appeal, vacate the MSJ Decision, and order the PUC to issue the CPG.

### A. The PUC Denial Order Effectively Prohibits PWS.

Under the TCA, "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). This statutory command "'precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines.'" Orange Cty.-Poughkeepsie L.P. v. Town of E. Fishkill, 632 F. App'x 1, 2 (2d Cir. 2015) (summary order) (quoting Willoth, 176 F.3d at 643).

The result in the District Court, in which ITW's effective prohibition claim was denied, is contrary to law. The District Court acknowledged that there is no dispute that ITW met its burden of proving the Coverage Gap for the National Carriers, the Police Department and ITW (SPA 32-33). Nonetheless, the District Court ruled that ITW failed to prove that the Tower Project poses the "least intrusive means" of filling the Coverage Gap for all (SPA 33-38). In reaching this result, the District Court committed a series of errors:

- Gaps in Coverage are Assessed Carrier-by-Carrier. The District Court held that a 120-foot tower would be less intrusive than the proposed

-19-

140-foot Tower without considering the undisputed fact that a 120-foot tower would not fill the Coverage Gap for ITW and all National Carriers, and the District Court did so even though effective prohibition analysis requires a carrier-by-carrier assessment. Thus, regardless of any visibility differences between a 120-foot tower and a 140-foot tower, the 140-foot Tower is <u>per</u> <u>se</u> the "least intrusive means" to fill the Coverage Gap for ITW and all National Carriers (SPA 14-35).

- <u>The "Least Intrusive Means" Standard Requires Consideration of More than the Question of Aesthetics</u>. The District Court misapprehended this Court's two-pronged "least intrusive means" test and the fact that this Court was construing the TCA's effective prohibition clause; this Court did not intend to elevate a lone aesthetics siting criterion to allow the effective prohibition of PWS. Such a criterion was intended to comprise one of multiple factors to consider when determining whether PWS is being effectively prohibited (SPA 33-34).

- <u>Effective Prohibition Claims are to be Heard De Novo with No Deference to State or Local Siting Authorities' Factual Findings, and Intrusiveness is a Factual Question rather than a Legal Question</u>. Multiple experts opined that the proposed 140-foot Tower would not be visually intrusive at all. There was no countervailing evidence. The District Court substituted its opinion of what this expert testimony ultimately means on a fact question on summary judgment. As this expert evidence of the Tower's lack of visual intrusiveness went unrebutted, Rule 56 mandated the entry of summary judgment for ITW. (<u>Compare</u> Appx214-283, 442-510, 553-609 <u>with</u> SPA 15-38).

Each District Court error is addressed in turn below. And each error, standing alone, justifies reversal.

### 1. **Effective Prohibition Claims are Assessed Carrier-by-Carrier.**

The first fatal flaw in the PUC Denial Order and the District Court's MSJ Decision is the failure to account for how effective prohibition claims are assessed: Whether gaps in PWS coverage are evaluated carrier-by-carrier, or whether the

existence of any PWS from any carrier means there is not a gap in coverage. This is a question of statutory construction. The principles governing the answer are familiar, and those principles along with the decisional law and regulatory guidance hold that this is to be a carrier-by-carrier assessment. Based on the correct legal standard, ITW maintains respectfully that it is entitled to relief because the Tower Project is **the only way** -- and thus the "least intrusive means" -- to fill the Coverage Gap for ITW and all National Carriers, each of which has a significant gap in coverage (SPA 32-33).

"As in all statutory construction cases, we begin with the language of the statute." Linza v. Saul, 990 F.3d 243, 248 (2d Cir. 2021) (internal quotes omitted). However, "courts should not examine 'a particular statutory provision in isolation,' but rather should read the words in 'context and with a view to their place in the overall statutory scheme' and 'fit, if possible, all parts into an harmonious whole.'" Id. (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000) (internal quotes and citations omitted)). "Further, 'the meaning of one statute may be affected by others.'" Linza, 990 F.3d at 248 (brackets omitted) (quoting Brown & Williamson, 529 U.S. at 133).

The effective prohibition clause proscribes any "regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government" that has "the effect of prohibiting the provision of personal

wireless services" for the overall congressional purpose of facilitating the rapid deployment of telecommunications infrastructure. 47 U.S.C. § 332(c)(7)(B)(i)(II). The TCA also expressly prohibits discrimination among carriers. <u>See</u> 47 U.S.C. § 332(c)(7)(B)(i)(I). Construing the statute to mean that the existence of some coverage from one carrier forecloses an effective prohibition claim by other carriers would frustrate congressional intent and result in unlawful discrimination among carriers.

This Court has yet to rule on the question of whether effective prohibition claims are assessed on a carrier-by-carrier basis. <u>See</u> <u>Omnipoint Commc'ns, Inc. v. City of White Plains</u>, 430 F.3d 529, 535 n.3 (2d Cir. 2005) (describing the question as "unsettled"). While this Court has not answered explicitly this precise statutory interpretation question, in construing 47 U.S.C. § 253, this Court has remarked that, "in determining whether an ordinance has the effect of prohibiting the provision of telecommunications services, it 'considers whether the ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment.'" <u>TCG N.Y., Inc. v. City of White Plains</u>, 305 F.3d 67, 76 (2d Cir. 2002) (brackets omitted) (quoting <u>Cal. Payphone Ass'n</u>, 12 FCC Rcd. 14191, 14206 (1997)).

Section 253(a), like § 332(c)(7)(B)(i)(II), contains a substantially identical TCA effective prohibition clause. <u>Compare</u> 47 U.S.C. § 253(a) ("No State or local

statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.") with 47 U.S.C. § 332(c)(7)(B)(i)(II) ("The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services.").

The Southern District of New York has held that § 253(a) and § 332(c)(7)(B)(i)(II)'s legal standards are "the same." See N.Y. SMSA Ltd. P'ship v. Town of Clarkstown, 603 F. Supp. 2d 715, 732 (S.D.N.Y 2009).

In TCG New York, this Court expressly acknowledged the pro-competitive and anti-discriminatory intent animating the TCA writ-large and that, as part of that intent, courts should consider whether judicial interpretation and implementation of the statute would yield pro-competitive, versus anti-competitive, results. And in doing so, this Court gave interpretative weight to the statutory guidance provided by the FCC. See 305 F.3d 76 (quoted above) (quoting Cal. Payphone Ass'n, 12 FCC Rcd. 14191, 14206 (1997)).

Since 2009, when the FCC issued In the Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(b), 24 F.C.C. Rcd. 13994 (Nov. 18, 2009) (the "Shot Clock Order"), District Courts in this Circuit have held that the

effective prohibition inquiry is carrier-by-carrier. See, e.g., Up State Tower Co, LLC v. Vill. of Lakewood, 431 F. Supp. 3d 157, 171-72 (W.D.N.Y. 2020) (citing cases and authorities); Crown Castle NG E. Inc. v. Town of Greenburgh, No. 12-CV-6157 (CS), 2013 WL 3357169, at *19 (S.D.N.Y. July 3, 2013) (citing cases and authorities), aff'd, 552 F. App'x 47 (2d Cir. 2014) (summary order).

Even before the FCC's 2009 Shot Clock Order came down, District Courts in this Circuit adopted the carrier-by-carrier approach. See, e.g., T-Mobile Ne. LLC v. Town of Ramapo, 701 F. Supp. 2d 446, 458 (S.D.N.Y. 2009) ("How to judge a significant gap in coverage is a hard question, but the Court believes that the provider-based approach is consistent with Willoth and sits more easily with the goals the TCA was designed to advance."). And as the Court explained in Independent Wireless One Corp. v. Town of Charlotte, 242 F. Supp. 2d 409 (D. Vt. 2003):

> If the fact that a provider or providers have coverage in an area is sufficient reason to deny an application by a new provider, even if the provider's proposal is the least intrusive means by which it could fill the gap in its service, the existing companies will have a monopoly on the area and a disincentive to seek out new technological developments, subverting the purpose of the TCA…. This Court rejects the so-called "single provider theory[.]"

Id. at 420, 423.

Multiple court from outside this Circuit have reached the same conclusion concerning the TCA's effective prohibition clause. See, e.g., MetroPCS, Inc. v. City

and Cty. of San Francisco, 400 F.3d 715, 733 (9th Cir. 2005) ("a significant gap in service (and thus an effective prohibition of service) exists whenever a provider is prevented from filling a significant gap in its own service coverage") (emphasis in the original), abrogated on other grounds by T-Mobile S., LLC v. City of Roswell, 574 U.S. 293 (2015); Second Generation Props., L.P. v. Town of Pelham, 313 F.3d 620, 632-35 (1st Cir. 2002) (citing cases and authorities); Cellco P'ship v. White Deer Twp. Zoning Hearing Bd., 609 F. Supp. 3d 331, 338 (M.D. Pa. 2022) ("a significant gap can exist within a provider's own coverage"), aff'd, 74 F.4th 96 (3d Cir. 2023); AT&T Mobility Servs., LLC v. Vill. of Corrales, 127 F. Supp. 3d 1169, 1173 (D.N.M. 2015) ("the parties both recognize that a decision by the Village preventing AT & T from closing a 'significant gap' in its existing service would be cognizable in an action brought under section 332(c)"), aff'd, 642 F. App'x 886 (10th Cir. 2016).

Lastly, in 2009, in rendering interpretative guidance about the TCA's meaning and effect, the FCC ruled that a "State or local government that denies an application for personal wireless service facilities siting solely because 'one or more carriers serve a given geographic market' has engaged in unlawful regulation that 'prohibits or ha[s] the effect of prohibiting the provision of personal wireless services, within the meaning of Section 332(c)(7)(B)(i)(II)." Shot Clock Order, 24 F.C.C. Rcd. 13994, 14016 (Nov. 18, 2009) (footnote omitted). The FCC concluded that "the fact

that another carrier or carriers provide service to an area is an inadequate defense under a claim that a prohibition exists, and we conclude that any other interpretation of this provision would be inconsistent with the Telecommunications Act's pro-competitive purpose." Id.

ITW summarized the carrier-by-carrier law in the proceedings below (Appx086-087), but the District Court was not persuaded or, respectfully, did not appreciate the significance of the rule. The carrier-by-carrier approach vitiates any justification for the District Court's holding that a 120-foot tower could be required because it is less intrusive than the 140-foot Tower, where, as here, ITW and each National Carrier has a significant gap in coverage (Appx104-126).

Under the carrier-by-carrier analysis, allowing only one of the National Carriers to co-locate on a 120-foot tower would effectively prohibit the remaining National Carriers from providing wireless service in the Coverage Gap. In other words, a 120-foot tower is not the "least intrusive means" of closing the Coverage Gap for each National Carrier. It would literally fail to close the Coverage Gap for several of them, in violation of the TCA (Appx109-110).[4] Accordingly, as a matter of undisputed fact (and thus law), the Tower Project is the "least intrusive means" of filling the Coverage Gap for all National Carriers, ITW and the Police Department,

---

[4] The PUC Denial Order does not authorize a telecommunications tower at any height, rendering this whole line of reasoning—that the PUC could lawfully prefer a 120-foot tower rather than the 140-foot Tower proposed—a straw man.

On this basis alone, the PUC Denial Order and the District Court's MSJ Decision should be reversed.

**2.** **The "Least Intrusive Means" Test Does Not Mean that State and Local Siting Criteria are All that Matters.**

This Court adopted the "least intrusive means" test to provide guidance to lower courts on how to administer plain statutory text proscribing the effective prohibition of PWS. It is true that the TCA "strikes a balance between two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529, 531 (2d Cir. 2005) (internal quotes omitted). However, striking a balance does not countenance elevating state and local siting criteria -- such as aesthetics -- above the language of the TCA itself.

The TCA commands that such factors cannot be deployed to effectively prohibit PWS. This Court has already recognized the TCA's substantively preemptive nature: "We have no doubt that Congress may preempt state and local governments from regulating the operation and construction of a national telecommunications infrastructure, including construction and operation of personal wireless communications facilities." Cellular Phone Task Force v. FCC, 205 F.3d 82, 96 (2d Cir. 2000). The "least intrusive means" test is to be understood within the context in which this Court adopted it—a context in which Congress decided expressly to preempt local regulation when it has the effect of prohibiting PWS.

-27-

Indeed, different Circuits employ different tests. The First and Seventh Circuits follow the "only feasible plan" test for the second prong of effective prohibition claims. See Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 50 (1st Cir. 2009) (citing cases); VoiceStream Minneapolis, Inc. v. St. Croix Cty., 342 F.3d 818, 834-36 (7th Cir. 2003) (agreeing with the First Circuit's approach).

The Fourth Circuit directs its district courts to decide the effective prohibition question using a "case-by-case analysis" without a particular test, only asking whether "the denial of a permit for a particular site ha[s] the effect of prohibiting wireless service." 360 Degrees Commc'ns Co. v. Bd. of Supervisors, 211 F.3d 79, 87 (4th Cir. 2000).

The Eighth Circuit has not adopted a particular test. See T-Mobile Ne. LLC v. Fairfax Cty. Bd. of Supervisors, 672 F.3d 259, 279 n.4 (4th Cir. 2012) (discussing USCOC of Greater Iowa, Inc. v. Zoning Bd. of Adjustment, 465 F.3d 817, 825 (8th Cir. 2006), and observing that the Eighth Circuit has effectively declined to adopt a formal test).

This Court and the Ninth and Tenth Circuits follow the "least intrusive means" test. See Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999); Am.

Tower Corp. v. City of San Diego, 763 F.3d 1035, 1056 (9th Cir. 2014); AT&T Mobility Servs., LLC v. Vill. of Corrales, 642 F. App'x 886, 889 (10th Cir. 2016).[5]

The Third Circuit, which previously employed the "least intrusive means" test, abrogated it recently in favor of the FCC's "materially inhibit" standard. See Cellco P'ship v. White Deer Twp. Zoning Hearing Bd., 74 F.4th 96, 102 (3d Cir. 2023) ("we believe that the FCC's interpretation is a reasonable interpretation of the statute, [and] we adopt the 'materially inhibit' standard today").

Practically speaking, "[i]t is unclear how much these different articulations of the tests truly differ." City of Cranston, 586 F.3d at 50. Applications of these tests generally turn on the same criteria:

- **Whether there was a good faith effort to identify alternative sites** (compare Orange Cty.-Poughkeepsie L.P. v. Town of E. Fishkill, 632 F. App'x 1, 3-4 (2d Cir. 2015) (summary order) and APT Pittsburgh Ltd. P'ship v. Penn Twp., 196 F.3d 469, 480 (3d Cir. 1999) with City of Cranston, 586 F.3d at 50-53 and VoiceStream, 342 F.3d at 834-36);

- **The height of the tower** (compare Willoth, 176 F.3d at 643 with Green Mt. Realty Corp. v. Leonard, 750 F.3d 30, 41 (1st Cir. 2014) and

---

[5] The Tenth Circuit has before it an appeal in which it will be asked to reconsider the "least intrusive means" test. See Horizon Tower Ltd., LLC v. Park Cty., No. 2:23-CV-37-ABJ, 2024 WL 4525229 (D. Wyo. Oct. 4, 2024), appeal docketed, No. 24-8069 (10th Cir. Oct. 9, 2024). ITW submits that such a move is unnecessary here. Without jettisoning the existing test, this Court can clarify its meaning to make plain that district courts must consider more than aesthetic considerations in determining whether a given proposal or application is the "least intrusive means." Expanding the "least intrusive means" inquiry to include the various non-aesthetics factors that other Circuits consider would help harmonize the law under the TCA.

TowerNorth Dev., LLC v. City of Geneva, No. 22 C 4151, 2024 WL 621616, at *16-17 (N.D. Ill. Feb. 14, 2024));

- **Technical feasibility** (compare Omnipoint Commc'ns, Inc. v. Town of LaGrange, 658 F. Supp. 2d 539, 560 (S.D.N.Y. 2009) and Nextel Partners of Upstate N.Y., Inc. v. Town of Canaan, 62 F. Supp. 2d 691, 697 (N.D.N.Y. 1999) with City of Cranston, 586 F.3d at 52 and Primeco Pers. Commc'ns v. City of Mequon, 242 F. Supp. 2d 567, 577-78 (E.D. Wis. 2003), aff'd, 352 F.3d 1147 (7th Cir. 2003));

- **The financial costs** associated with the tower (compare Cellco P'ship v. White Deer Twp. Zoning Hearing Bd., 74 F.4th 96, 104 (3rd Cir. 2023) and T-Mobile Ne. LLC v. Town of Ramapo, 701 F. Supp. 2d 446, 462-63 (S.D.N.Y. 2009) with City of Cranston, 586 F.3d at 52-53 and City of Geneva, 2024 WL 621616, at *24-25);

- **The general aesthetic impact** of a tower and means of reducing the impact (see USCOC of Greater Iowa, 465 F.3d at 822-23; Willoth, 176 F.3d at 643 (citing cases, including Town of Amherst v. Omnipoint Commc'ns Enters., Inc., 173 F.3d 9, 14-15 (1st Cir. 1999)); and

- **Whether co-location is a possibility** (compare Nextel Partners, Inc. v. Town of Amherst, 251 F. Supp. 2d 1187, 1196 (W.D.N.Y. 2003) with Second Generation Props., L.P. v. Town of Pelham, 313 F.3d 620, 635 (1st Cir. 2002) and AT & T Wireless PCS, Inc. v. Town of Porter, 203 F. Supp. 2d 985, 999-1000 & n.17 (N.D. Ill. 2002)).

Respectfully, the District Court misunderstood the legal standard to employ.

It appears the District Court believed all that mattered to deny relief to ITW was

whether there is an arithmetically expressible difference in visibility between a 120-

foot tower and ITW's proposed 140-foot Tower, i.e., a difference of 0.6% (SPA 33-

34). This was legal error because it reduced this Court's "least intrusive means" test

to an aesthetic consideration, i.e., a single state and/or local land-use siting criterion.

The aesthetics criterion may be relevant to the effective prohibition calculus, but it cannot be dispositive of an effective prohibition claim without gutting congressional intent. The TCA's effective prohibition clause is not centrally directed to state and local siting criteria which, under the Supremacy Clause, must yield to the TCA when those criteria effectively prohibit PWS. See Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529, 531 (2d Cir. 2005) ("subject to five specific limitations, see id. §§ 332(c)(7) (B)(i)-(v), local governments retain express control over the zoning of wireless services facilities"); Second Generation Props., 313 F.3d at 627 ("The TCA preserves state and local authority over the siting and construction of wireless communication facilities, subject to five exceptions specified in the Act.") (citing 47 U.S.C. § 332(c)(7)(B)). ITW maintains respectfully that the District Court committed reversible error when it disregarded this legal reality.

### 3. Effective Prohibition Claims are Heard De Novo, Intrusiveness is a Fact Question, and There was No Evidence to Find that the 140-Foot Tower is Intrusive.

The District Court's final error concerns the applicable evidentiary standard for effective prohibition claims, and the improper findings of fact and assessment of credibility on summary judgment. While this Court has never addressed the question directly, virtually every court to consider it has held that effective prohibition claims are heard de novo. See, e.g., AT&T Mobility Servs., LLC v. Vill. of Corrales, 642

F. App'x 886, 888-89 & n.1 (10th Cir. 2016) ("courts have uniformly held the question to be a legal one for the district court's consideration in the first instance, without any deference to a local zoning board") (footnote omitted) (citing cases); Green Mt. Realty Corp. v. Leonard, 750 F.3d 30, 38-39 (1st Cir. 2014) (citing cases); T-Mobile Ne. LLC v. Loudoun Cty. Bd. of Supervisors, 748 F.3d 185, 192 (4th Cir. 2014) (citing cases); Helcher v. Dearborn Cty., 595 F.3d 710, 727 (7th Cir. 2010) ("Our review of the prohibition-of-service claim is de novo."); APT Pittsburgh Ltd. P'ship v. Penn Twp., 196 F.3d 469, 475 (3d Cir. 1999) (effective prohibition "decision is to be made de novo by a reviewing court that will not necessarily be limited to the record compiled by the state or local authority"); Los Angeles SMSA Ltd. P'ship v. City of Los Angeles, No. 2:16-cv-04954-FLA (SKX), 2021 WL 3741539, at *4 (C.D. Cal. Aug. 24, 2021) (collecting cases); PI Telecom Infrastructure, LLC v. City of Jacksonville, 104 F. Supp. 3d 1321, 1346 (M.D. Fla. 2015) (same).

At least one district court in this Circuit recognized this standard as appropriate for effective prohibition claims. See New Cingular Wireless PCS, LLC v. Conn. Siting Council, No. 11cv1502 (WWE), 2012 U.S. Dist. LEXIS 116893, at *2 (D. Conn. Aug. 12, 2012) (denying motion to strike, holding "[i]n evaluating an effective prohibition claim, district courts are free to consider additional evidence not in the administrative record") (internal quotes omitted) (citing cases).

The effect of this question, one of substantive preemption, being heard de novo is that district courts are not to give deference to the factual findings of state and local siting authorities (see, e.g., Village of Corrales, 642 F. App'x at 888-89; Green Mt. Realty, 750 F.3d at 39), and are free to consider evidence outside of the closed administrative record. See, e.g., Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 22 (1st Cir. 2002) (citing Second Generation Props., 313 F.3d at 629); T-Mobile S., LLC v. City of Roswell, No. 1:10-CV-1464-AT, 2016 WL 11745937, at *17 (N.D. Ga. Oct. 7, 2016) (collecting cases).

Ultimately, the effective prohibition inquiry poses a fact question to be resolved by evidence in the administrative record and/or outside of that record according to the Rules of Evidence and Rules of Civil Procedure. Here, the District Court posited that whether the effective prohibition analysis should be conducted on a closed record or de novo would make no difference (SPA 32 n.16). However, this indifference to the applicable standard underscores the District Court's plain error.

The only evidence about "intrusiveness" in the summary judgment record was the expert evidence provided by Perkins and Hodgetts. Both experts opined that the Tower would be barely visually perceptible in the VSA and that reducing the Tower's height from 140 feet to 120 feet would not appreciably affect visibility, nor would it affect the locations from where the Tower would be visible within the VSA. (Appx216, 222, 224, 471-474, 589-590, 600, 602).

For example, Perkins found that, at 140 feet, the Tower would be visible from 3.1% of the VSA and, at 120 feet, 2.5% of the VSA, or a difference of 0.6% of the VSA (Appx471). To disregard the ultimate opinions of both experts, the District Court made the impermissible inference that a 0.6% difference in visibility with respect to a barely visible telecommunications tower rendered that facility not the "least intrusive means" to fill an admitted coverage gap. The District Court disregarded this evidence, found its own facts based on the raw results upon which this expert opinion testimony was founded, and substituted a different standard to deny relief than imposed by this court.

According to the District Court—regardless of the Tower's overall lack of visibility at either height, and the nominal difference in visibility between the two heights—if the Tower would be less visible at 120 feet than 140 feet, this fact alone disqualifies it as the "least intrusive means" to fill the admitted Coverage Gap (SPA 33-34). "Intrusive," does not mean visible, however—it is a qualitative characterization about the degree of a tower's visibility—and it is a fact question to which ITW was due all inferences on the PUC Defendants' summary judgment cross-motion. See Schwebel v. Crandall, 967 F.3d 96, 102 (2d Cir. 2020).

Relatedly, the District Court focused on whether ITW had proven conclusively that the Tower would not be seen from any homes (SPA 33), but the standard is not whether a facility will be seen from any homes or not. Rather, the

-34-

standard is whether a proposal is the "least intrusive means" to fill a significant gap in PWS coverage. "Least intrusive" denotes some level of intrusiveness, and that something is visible does not mean it is necessarily "intrusive" at all. In setting this standard, this Court could not have meant that facilities must be invisible. This is so at least in part because PWS relies upon line-of-sight technology (Appx104, ¶ 5, 105 ¶ 13, 354-355, 950) that would be rendered useless if invisibility were the standard.

Significantly, the PUC had no countervailing evidence on this fact issue to be decided de novo. As the PUC supplied no countervailing evidence, there was no genuine dispute of material fact, and ITW was entitled to judgment as a matter of law. See Orange Cty.-Poughkeepsie L.P. v. Town of E. Fishkill, 632 F. App'x 1, 3-4 (2d Cir. 2015) (summary order) (affirming summary judgment for tower proponents on their effective prohibition claim where "[i]t was undisputed that, due to topographic considerations, the proposed facility could not be made less intrusive by reducing its height").

Instead of entering summary judgment for the PUC Defendants, the District Court was duty-bound to enter permanent equitable relief in ITW's favor as the PUC Defendants offered no contrary evidence to create a triable issue. Cf. id. at 4 ("the [trial] court correctly determined that the proper remedy was injunctive relief— specifically, requiring issuance of the requested permit").

Accordingly, the District Court's MSJ Decision should be reversed and remanded with instructions to require issuance of the CPG to ITW.

### B. The PUC Denial Order Violated the TCA's Substantial Evidence Clause.

To ensure that "local law ... is fairly administered[,]" Town of Amherst v. Omnipoint Communications Enterprises, Inc., 173 F.3d 9, 16 (1st Cir. 1999), the TCA's substantial evidence clause imposes three requirements: Siting authorities must (1) distill their denial decisions to writing and give written reasons for their denial decisions, see T-Mobile S., LLC v. City of Roswell, 574 U.S. 293, 300, 302 (2015); (2) apply the relevant criteria under state and local law, as written, rather than ad hoc standards, to deny relief, see T-Mobile Central, LLC v. Unified Gov't of Wyandotte Cty., 546 F.3d 1299, 1308 (10th Cir. 2008) (citing cases, including Town of Amherst, 173 F.3d at 14); and (3) have substantial evidence to support their denial decisions. See City of Roswell, 574 U.S. at 301 (quoting H.R. Conf. Rep. No. 104-458, p. 208 (1996)). Here, the PUC Defendants erred on the law and the evidence.

### 1. While the Regional Plan Requires a Proposed Telecommunications Facility to be the "Least Obtrusive System Possible," it Also Expresses a Preference for Co-Location, as Does State Statutory Law.

"'Substantial evidence' review under the TCA does not create a substantive federal limitation upon local land use regulatory power, but is instead 'centrally directed to those rulings that the Board is expected to make under state law and local

ordinance in deciding on variances, special exceptions and the like.'" <u>Southwestern Bell Mobile Sys., Inc. v. Todd</u>, 244 F.3d 51, 58 (1st Cir. 2001) (quoting <u>Town of Amherst</u>, 173 F.3d at 16). Thus, a local board cannot base its denial decision on criteria not applicable under state and local law. <u>See</u> <u>Wyandotte Cty.</u>, 546 F.3d at 1308 ("By inventing a criterion for which the applicable local ordinances did not provide, the Board failed to act on the basis of substantial evidence."); <u>Indus. Tower & Wireless, LLC v. Haddad</u>, 109 F. Supp. 3d 284, 298 (D. Mass. 2015) ("It is the local zoning Bylaw which provides the applicable standard for issuing a Special Permit, and it is with reference to this standard that the Court must evaluate the 'substantial evidence' question.").

To be "supported by substantial evidence, the proffered reasons must comport with the objective criteria in existence (i.e.[,] zoning regulations, permit application policies, etc.). Governing bodies cannot simply arbitrarily invent new criteria in order to reject an application." <u>Wyandotte Cty.</u>, 546 F.3d at 1308 (internal quotes omitted) (citing, <u>inter alia</u>, <u>Town of Amherst</u>, 173 F.3d at 14). <u>See also</u> <u>Haddad</u>, 109 F. Supp. 3d at 300 ("Because the ZBA's stated reasons for denying ITW's application were not based on the Bylaw criteria, the Court finds that the Board's decision was not supported by substantial evidence.").

The relevant Regional Plan imposes a criterion substantially identical to the second prong of this Court's effective prohibition test, <u>i.e.</u>, that a proposed tower be

the "least obtrusive system possible" for providing needed PWS (Appx851, ¶ 3). State statutory law <u>and</u> the Regional Plan also favor co-location (<u>see</u> 30 V.S.A. § 202c(b)(9); Appx851, ¶ 4(b)), <u>i.e.</u>, fewer taller towers rather than more shorter towers, to avoid the very pincushion effect suggested by former Vermont Senator Patrick Leahy's quotation with which the District Court began its MSJ Decision (SPA 1).

Nevertheless, the District Court approved the PUC Defendants' tortured interpretation of the Regional Plan's "least obtrusive system possible" siting criterion as an immutable requirement that the Tower be essentially invisible (SPA 33). The District Court also sustained the elevation of this standard over the preference for co-location in State statutory law and the very same Regional Plan (SPA 33). Ironically, the PUC Defendants' overfocus on the aesthetics of one tower that would accommodate all National Carriers would lead to the very pincushion phenomenon the District Court cited in sustaining the PUC Denial Order (SPA 1).

Thankfully, substantial evidence review requires courts to scrutinize the legal standards applied below to ensure that those criteria are administered rationally rather than arbitrarily and capriciously. "By inventing a criterion for which the applicable local ordinances did not provide," <u>i.e.</u>, imposing an invisibility criterion and ignoring the express preference for co-location, the PUC Defendants "failed to act on the basis of substantial evidence." <u>Wyandotte Cty.</u>, 546 F.3d at 1308.

2.     **The PUC Denial Order Lacks Substantial Evidence.**

To determine whether a decision is supported by substantial evidence, courts employ the "traditional standard used for judicial review of agency actions." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 494 (2d Cir. 1999) (internal quotes omitted). See T-Mobile S., LLC v. City of Roswell, 574 U.S. 293, 301 (2015) ("the phrase 'substantial evidence contained in a written record' is the traditional standard used for review of agency actions") (internal quotes and brackets omitted). "This standard of review is deferential, and [the court] may neither engage in [its] own fact-finding nor supplant the [PUC]'s reasonable determinations." Town of Oyster Bay, 166 F.3d at 494.

"Substantial evidence, in the usual context, has been construed to mean less than a preponderance, but more than a scintilla of evidence. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Universal Camera v. NLRB, 340 U.S. 474, 477 (1951) (internal quotes omitted)). "However, the record should be viewed in its entirety, including evidence opposed to the [PUC]'s view." Town of Oyster Bay, 166 F.3d at 494. Here, there was **no** evidence for the PUC Denial Order. It should be annulled, and an injunction should enter authorizing ITW to construct the Tower at the Tower Site.

In the PUC proceedings, ITW demonstrated that a Coverage Gap exists, that there is a need for service in the Coverage Gap, and that the proposed Tower would

remedy the situation. There has never been any dispute that these facts were established (SPA 32-33). In addition, ITW demonstrated that the proposed Tower is the only feasible and least obtrusive alternative to fill the Coverage Gap.

Since ITW made a good-faith and extensive effort to evaluate alternative sites, the burden should have shifted to the PUC to demonstrate that there is substantial evidence in the record that a more feasible site exists to remedy the Coverage Gap. See, e.g., Up State Tower Co., LLC v. Town of Tonawanda, No. 1:18-CV-00952 LJV(MJR), 2020 WL 8083693, at *13 (W.D.N.Y. Nov. 18, 2020) (granting summary judgment to carrier that met its burden and "defendants' claims to the contrary are not supported by substantial evidence") (citing cases), rep. and rec. adopted, 2021 WL 50906 (W.D.N.Y. Jan. 6, 2021); New York SMSA Ltd. P'ship v. Inc. Vill. of Mineola, No. 01-CV-8211(JS)(WDW), 2003 WL 25787525, at *9 (E.D.N.Y. Mar. 26, 2003) ("Verizon met its burden of investigating alternatives and presented credible evidence regarding the infeasibility of the sites and the Board presented no evidence to the contrary") (quoted with approval in Up State Tower Co., LLC v. Town of Kiantone, No. 1:16-CV-00069-MAT, 2019 WL 1117220, at *8 (W.D.N.Y. Mar. 11, 2019), adhered to on denial of reconsideration, 2019 WL 6320335 (W.D.N.Y. Nov. 26, 2019), aff'd, 820 F. App'x 75 (2d Cir. 2020) (summary order)); New Cingular Wireless PCS, LLC v. Town of Fenton, 843 F. Supp. 2d 236, 256-57 (N.D.N.Y. 2012) ("The board presented no evidence that other

sites were appropriate substitutes for the proposed property, and Verizon met its burden of investigating alternatives and presented credible evidence regarding the infeasibility of the sites") (footnote omitted) (discussing <u>New York SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals</u>, No. 08-CV-4833 JS AKT, 2010 WL 3937277, at *6 (E.D.N.Y. Sept. 30, 2010)).

There is **no** evidence in the record – much less substantial evidence – to demonstrate that a more feasible site exists to remedy the Coverage Gap. Indeed, there is no feasible alternative site (Appx106-110). The TCA requires that a state permitting authority's decision to deny an application must be based on "substantial evidence." 47 U.S.C. § 332(c)(7)(B)(iii). The PUC failed to meet even a low "scintilla" standard with the baseless opinion that there is a significant difference between a 120-foot tower and a 140-foot Tower.

The applicable standard on aesthetics is that the Tower be the "least obtrusive system possible," not that it be invisible from area dwellings. The District Court thus committed reversible error in holding ITW to the latter rather than the former. See <u>Kohler v. Astrue</u>, 546 F.3d 260, 265 (2d Cir. 2008) ("[f]ailure to apply the correct legal standard constitutes reversible error"). But even assuming the District Court applied the correct legal standard, the administrative record proves that the Tower would **not** be visible from the intervenors' homes.

There was literally **no** evidence that the Tower would be visually "obtrusive" to the surrounding environment. Two experts, one representing ITW and the other the DPS, opined explicitly that the Tower largely would not be visible, and visually insignificant overall, within the VSM. It is plain error to hold that a tower, the top half of which is visible from only 1.4% of a relevant VSM, is visually "obtrusive" (Appx462). The PUC's Denial Order did not meet the substantial evidence standard, and the District Court erred in equating any visibility with obtrusiveness. Moreover, neither the PUC nor the District Court considered the preference for co-location in State statutory law and the Regional Plan, which the Tower would only advance.

### C. Providing "Substantial Deference" to the NRPC Letter Violated the TCA's Substantial Evidence Clause.

Without actual substantial evidence, the PUC gave "substantial deference" to the NRPC's conclusory comment that the proposed Tower would be "unduly obtrusive" and denied ITW's CPG application solely on that basis (Appx753-754). However, the NRPC's "unduly obtrusive" opinion was not evidence itself, nor was this comment supported by any evidence, much less substantial evidence.

It is axiomatic under the TCA that unsupported aesthetics 'opinion' testimony opposing a proposed telecommunications tower – such as the NRPC's conclusory 'unduly obtrusive' comment – does not constitute "substantial evidence" within the meaning of § 332(c)(7)(B)(iii). See, e.g., Up State Tower Co, LLC v. Vill. of Lakewood, 431 F. Supp. 3d 157, 173-74 (W.D.N.Y. 2020) ("To deny a siting

application on aesthetic grounds, there must be substantial evidence: (1) that residents will be able even to see the antennae and (2) there will be an actual negative visual impact on the community.") (internal quotes omitted); Up State Tower Co., LLC v. Town of Tonawanda, No. 1:18-CV-00952 LJV(MJR), 2020 WL 8083693, at *12 (W.D.N.Y. Nov. 18, 2020) ("Here, defendants have put forth no admissible evidence to specifically demonstrate the aesthetic impact of either proposed tower. Thus, defendants' conclusory and unsupported statements of a negative aesthetic effect, considered in light of all the undisputed evidence before the Court, are insufficient to rise to the level of substantial evidence to support a permit denial."), rep. and rec. adopted, 2021 WL 50906 (W.D.N.Y. Jan. 6, 2021); and New Cingular Wireless PCS, LLC v. Town of Fenton, 843 F. Supp. 2d 236, 252 (N.D.N.Y. 2012) ("Although aesthetic impacts may be a reasonable basis for denying an application for a wireless communications facility, such a denial must be based on more than just unsupported opinion.") (citing cases).

The State statutory "substantial deference" requirement unlawfully elevates unsupported aesthetics commentary above actual and uncontroverted third-party expert evidence that a proposed tower would have minimal aesthetics impact.[6] Section 248a defines "substantial deference" as follows: "the plans and

---

[6] The NRPC did not participate in the January 12, 2023 PUC Merits Hearing. Hence, there was no opportunity to cross-examine regarding the points in their unsworn letters (Appx512-648).

recommendations referenced under subdivision (c)(2) of this section are <u>presumed correct, valid, and reasonable</u>." 30 V.S.A. § 248a(b)(5) (emphasis added). This "presumed correct, valid and reasonable" standard is derived from Vermont administrative law. <u>See</u> <u>generally</u> <u>In re Morrisville Hydroelectric Project Water Quality</u>, 2019 VT 84, ¶ 41, 211 Vt. 233, 224 A.3d 473 ("Decisions of an [administrative] agency within its expertise are presumed correct, valid and reasonable.") (internal quotes omitted).

A recent global federal-state Westlaw search revealed a total of 28 cases that use the phrase, "presumed correct, valid and reasonable," all of them from the Vermont Supreme Court. In other words, no federal court has ever mentioned this standard, and 49 of the 50 states do not use this standard. The Vermont Legislature cannot anoint a regional planning commission's unsupported aesthetics opinion regarding a proposed tower to the level of TCA "substantial evidence."

And yet, the PUC Denial Order was based on no other "substantial evidence" –- that is, no 'evidence' more substantial than the NRPC's unsupported aesthetics opinion. This is a far cry from the required "more than a scintilla of evidence." <u>See</u> <u>Sprint Spectrum, L.P. v. Willoth</u>, 176 F.3d 630, 638 (2d Cir. 1999). The "substantial deference" standard, therefore, as has been implemented in Vermont and in no other state, directly contradicts the TCA's "substantial evidence" standard. The "State law substantial deference" provision has improperly supplanted expert opinions and full

-44-

record review of the evidence with the factually baseless unsworn letter opinion of a small group of non-experts.

In sum, the PUC's giving of "substantial deference" (as defined in 30 V.S.A. § 248a(b)(5)) to NRPC's conclusory advisory opinion that was devoid of substantial evidence violates the TCA. The substantial evidence clause preempts Vermont statutory law, to the extent State law may have mandated that the PUC give "substantial [evidentiary] deference" and a rebuttable presumption to unfounded opinions from the NRPC in this case.

## VI.  CONCLUSION

ITW respectfully requests that this Court vacate the District Court's MSJ Decision and remand the case to the District Court with instructions to order the PUC to issue the CPG to authorize ITW's construction of the 140-foot Tower.

Dated: January 2, 2025
    Burlington, Vermont                    Respectfully submitted,

                                By:    /s/ Daniel A. Seff
                                       Daniel A. Seff, Esq.
                                       MSK ATTORNEYS
                                       275 College Street
                                       P.O. Box 4485
                                       Burlington, VT 05406-4485
                                       Phone: (802) 861-7000 (ext. 1190)
                                       Fax: (802) 861-7007
                                       Email: dseff@mskvt.com

                                       *Counsel for Plaintiff-Appellant*
                                       *Industrial Tower and Wireless, LLC*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This Brief complies with the word limitation of Local Rule 32.1(a)(4)(A) because this Brief contains 10,676 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this Brief was prepared in a proportionally spaced typeface using Microsoft Word for Mac (version 16.92) in Times New Roman 14-point font.

Dated: January 2, 2025
      Burlington, Vermont         Respectfully submitted,

By:    /s/ *Daniel A. Seff*
         Daniel A. Seff, Esq.
         MSK ATTORNEYS
         275 College Street
         P.O. Box 4485
         Burlington, VT 05406-4485
         Phone: (802) 861-7000 (ext. 1190)
         Fax: (802) 861-7007
         Email: dseff@mskvt.com

         *Counsel for Plaintiff-Appellant*
         *Industrial Tower and Wireless, LLC*

# SPECIAL APPENDIX

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 AUG 19  PM 1:46

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

INDUSTRIAL TOWER AND WIRELESS,          )
LLC,                                    )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )       Case No. 2:23-cv-365
                                        )
ANTHONY Z. ROISMAN,[1] MARGARET         )
CHENEY, and RILEY ALLEN, as they are    )
members of the STATE OF VERMONT         )
PUBLIC UTILITY COMMISSION,              )
                                        )
        Defendants.                     )

**OPINION AND ORDER**
**(Docs. 8, 12, 20, 22)**

Senator Patrick Leahy was quoted in 1998 as stating that Vermonters did not wish to be

left out of the telecommunications age, but also did not want Vermont "turned into a giant

pincushion with 200-foot towers sticking out of every mountain and valley."  Carey Goldberg,

*It's a Control Thing: Vermont vs. Cell Phone Towers*, N.Y. Times, Mar. 9, 1998, at A12.  Some

of the same themes appear in this case.

Plaintiff Industrial Tower and Wireless, LLC ("ITW") sues the three members of

Vermont's Public Utility Commission ("PUC") under Section 704 of the Telecommunications

Act of 1996, 47 U.S.C. § 332(c)(7) ("TCA"), challenging the PUC's August 3, 2023 Order

denying ITW's request for a certificate of public good under 30 V.S.A. § 248a for installation of

a wireless telecommunications facility—including a 140-foot lattice tower—in Enosburgh,

---

[1] Edward McNamara succeeded Anthony Z. Roisman as Chair of the Public Utility
Commission in 2024, shortly after Plaintiff filed its Amended Complaint.  Chair McNamara is
automatically substituted as a party under Fed. R. Civ. P. 25(d).

Vermont. The primary motions currently pending are Defendants' Amended Motion to Dismiss (Doc. 12) and ITW's Motion for Summary Judgment (Doc. 20). The court heard argument on the motions on May 24, 2024.

The court addresses a handful of procedural issues before proceeding to the facts and legal analysis in this case. First, Defendants' October 2023 Motion to Dismiss (Doc. 8) is directed to the original Complaint (Doc. 1). ITW filed an Amended Complaint in November 2023 (Doc. 9) and Defendants responded with an Amended Motion to Dismiss the Amended Complaint (Doc. 12). The court will therefore mark the October 2023 motion (Doc. 8) as moot.

At the May 2024 hearing, the court remarked that it might be sensible to convert the Amended Motion to Dismiss under Fed. R. Civ. P. 12 into a motion for summary judgment under Fed. R. Civ. P. 56. The defense agreed with that approach and suggested that there was no need to supplement the evidentiary record. The court granted a two-week period to file any supplemental memorandum on issues not addressed in the Amended Motion to Dismiss that might be relevant to that motion as converted to summary judgment. Defendants have not filed any supplemental memorandum. Although Defendants' Amended Motion to Dismiss does not itself present any "matters outside the pleadings," Fed. R. Civ. P. 12(d), the motion overlaps with ITW's summary judgment motion, which includes substantial documentation relevant to both motions. The court therefore concludes that conversion to summary judgment is both unopposed and proper. *See* 5C Charles Alan Wright et al., Federal Practice and Procedure § 1366 (3d ed.) ("[I]n some situations, conversion occurs even though neither party has introduced extra-pleading matter in connection with the Rule 12(b)(6) motion.").[2]

---

[2] Conversion of the Rule 12 motion also makes it unnecessary to rule on the parties' dispute as to whether courts can properly rule on the TCA claims at the motion-to-dismiss stage. (*See* Doc. 18 at 8, 12–13; Doc. 19 at 2.) Conversion also makes it unnecessary to analyze

2

**Standard of Review**

As a result of the rulings above, the competing dispositive motions in this case are both analyzed as summary judgment under Fed. R. Civ. P. 56. Courts grant summary judgment under Rule 56 "only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 227 (2d Cir. 2024) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)). "In determining whether genuine issues of fact exist . . . the court must review the record taken as a whole." *Id.* (internal quotation marks omitted). "In so doing, it must draw all reasonable inferences in favor of the nonmoving party, even though contrary inferences might reasonably be drawn." *Id.* (cleaned up). Insofar as conversion of Defendants' Rule 12 motion to a Rule 56 motion results in cross-motions for summary judgment, the court "evaluate[s] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 56 (2d Cir. 2021) (quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)).

**Facts**

The following facts are drawn from ITW's Statement of Undisputed Material Facts (Doc. 20-6), Defendants' Statement of Disputed Material Facts (Doc. 29-1), and the court's own

---

Defendants' reliance on *New Cingular Wireless PCS, LLC v. Incorporated Village of Muttontown*, No. 22-cv-5524, 2023 WL 8791107 (E.D.N.Y. Dec. 18, 2023), for the proposition that that courts can properly consider a motion to dismiss a TCA "substantial evidence" claim. (Doc. 19 at 2.) Defendants' unopposed Motion to Correct Reply corrects Defendants' reply memorandum in support of their Amended Motion to Dismiss (Doc. 12) to expressly characterize the citation to *New Cingular Wireless* as a report and recommendation. (Doc. 22.) The court will grant that motion, but it ultimately does not affect the analysis in this case.

review of the record.  Most of the facts are undisputed.  Disputes are noted below.  The court has

added some of its own point headings to aid in organization.

## I.      Background

The following general background is drawn primarily from the February 1, 2024

declarations of ITW's president Michael J. Umano (Doc. 20-1) and ITW's vice president of site

acquisition and development Kevin Delaney (Doc. 20-2).

### A.      ITW and ITW's SMR System

ITW is one of four interrelated entities that provide a broad array of telecommunications-

related services across New England and Florida.  ITW or its component entities have been in

business since 1974.  These entities—collectively referred to as "Industrial"—are: Industrial

Tower and Wireless, LLC, Industrial Communications, LLC, Industrial Communications &

Electronics, Inc., and Industrial Wireless Technologies, Inc.

ITW is Industrial's site acquisition, development, and tower site leasing business.  ITW

owns and operates approximately 150 tower facilities in New England, as well as sites in Florida,

Colorado, and Nebraska.  ITW also provides radio frequency ("RF") propagation and site leasing

management services to a sister company that operates a network from over 800 tower sites in

the Midwest.  ITW's network provides the infrastructure necessary to support its own 900 MHz

trunked digital commercial mobile radio service network, as well as infrastructure for federal,

state, and local public safety communications systems (including E911), third-party cellular and

personal communication service ("PCS") network coverage, wireless broadband and internet

services, microwave backhaul, and radio and TV broadcast.

FCC regulations define a "Specialized Mobile Radio [SMR] System" as "[a] radio system

in which licensees provide land mobile communications services (other than radiolocation

services) in the 800 MHz and 900 MHz bands on a commercial basis to entities eligible to be

licensed under this Part, Federal Government entities, and individuals." 47 C.F.R. § 90.7.[3]  One

of the Industrial entities—Industrial Wireless Technologies, Inc.—is the licensee of two relevant

Federal Communications Commission ("FCC") licenses for the "SMR" radio service.[4]

(Docs. 20-8, 20-10.)  The two FCC licenses relate to SMR services in locations including

multiple Vermont counties.

Industrial also constructs, owns, and operates wireless service facilities, including

communications towers, transmitters, and antenna structures for other providers of personal

wireless services, including cellular service carriers.  These facilities are constructed with the

intent to lease space to such providers as "co-location" sites to reduce tower proliferation and

advance the provision of wireless services.  As a tower site developer (in addition to being a

commercial mobile services provider), Industrial identifies gaps in coverage for the four national

carriers: AT&T, Verizon, T-Mobile, and Dish Wireless (the "National Carriers").  Industrial

---

[3] An FCC webpage elaborates regarding the usage of SMR systems:

Traditionally SMR systems were used for dispatch, but with the introduction of
cellular systems in the band two-way voice use has become more prominent.  The
development of a digital SMR marketplace has allowed new features and services,
such as internet access, two-way acknowledgment paging and inventory tracking,
credit card authorization, automatic vehicle location, fleet management, remote
database access, and voicemail.  The growth of SMR systems has been significant
due to these developments.

Fed. Commc'n Comm'n, Specialized Mobile Radio Service (SMR) (Mar. 8, 2017),
https://www.fcc.gov/wireless/bureau-divisions/mobility-division/specialized-mobile-radio-
service-smr [https://perma.cc/CYV4-MH3Y].

[4] Mr. Umano's declaration states that "Industrial Communications & Electronics, Inc." is
a Specialized Mobile Radio licensee.  (Doc. 20-1 ¶ 8.)  That may be true as to other FCC licenses
not relevant here.  In any case, to the extent that there is a dispute over which Industrial entity is
the licensee, the court concludes that the dispute is not material to any issue here.

5

SPA 005

works to identify sites at which to develop facilities to fill such gaps and permits and constructs facilities on such permitted sites.

ITW's Enhanced Specialized Mobile Radio ("ESMR") 900 MHz system[5] is a line-of-sight technology, which requires that radio signals pass between towers and the end-user's phone or mobile radio. To ensure continuous, high quality, and competitive services, ITW regularly performs propagation studies that identify coverage gaps for its own 900 MHz system, as well as those of other PWS providers, including the National Carriers.

**B.    Selection of Tower Sites; the National Carriers' Interests**

Tower sites are not selected at random. Rather, tower sites are selected based on identifying a need for coverage and then finding a suitable site that meets well-established telecommunications siting criteria, as detailed below. Initial RF studies are run using computer modeling programs. The propagation software packaged used is called Signal and was developed by EDX Wireless. The software uses detailed terrain databases where the individual terrain points are separated by approximately 200 feet or less. The propagation model type used to run the RF studies is called TIREM, which stands for Terrain Integrated Rough Earth Model. The National Telecommunications and Information Administration developed this model in conjunction with various branches of the U.S. Department of Defense. This model is widely used by the U.S. Government and military organizations, as well as by private companies such as ITW. With this propagation software, Industrial is able to predict service areas and path performance using propagation models that take into account key variables such as distance, terrain variation, vegetation, transmitter/receiver characteristics, and the wavelength of RF transmissions.

---

[5] ESMR is a type of SMR system.  47 C.F.R. § 90.7.

To design any of these types of communications systems, it is essential to specify the detailed parameters. The parameters include the location in latitude and longitude, ground elevations, antenna heights, frequency, power levels, antenna types and gain, transmission line loss, foliage, and receiver characteristics. This type of modeling is widely accepted in the wireless telecommunications industry for determining the existence and location of gaps in PWS coverage. Using the propagation models described above, ITW identifies suitable areas for sites to fill significant coverage gaps—with a view toward co-location of services at those sites.

After an area has been identified, a search for suitable tower sites is made within that area. The suitability of a tower site, within the gap area, is based upon numerous factors including: (a) RF characteristics, including coverage of the entire gap area, location, elevation, tree cover, and compatibility with the nearby towers being constructed; (b) constructability; (c) availability; (d) zoning; (e) wetlands; and (f) co-location capacity.

According to Mr. Umano: "[I]t is standard operating procedure in our industry for the National Carriers not to commit to lease space at, and agree to locate their equipment on, a proposed telecommunications facility until that facility has received all of its permits and approvals." (Doc. 20-1 ¶ 20.) Mr. Umano further states that "once those permits and approvals are in place, the National Carriers invariably choose to co-locate their equipment on an existing permitted site because doing so is more economical for them than permitting and building a new facility, and co-location facilitates speed to market." (*Id.*) And according to Mr. Umano: "In nearly every instance in which ITW has permitted a new telecommunications site for co-location purposes, carriers have committed to the site either after permitting or after construction." (*Id.* ¶ 21.) ITW has reached out to the National Carriers but none of them "have been willing to commit to co-locate their antennas and other equipment at the proposed tower prior to the

7

SPA 007

necessary permits and approvals being in place." (*Id.* ¶ 22.) Defendants assert that any testimony by Industrial personnel (including Mr. Umano) as to the National Carriers' future intentions "would be inadmissible speculation." (Doc. 29-1 ¶¶ 26, 42.)

C.    **The Proposed Project**

ITW has only recently begun to build out its ESMR 900 MHz system in Vermont. ITW has received Certificates of Public Good ("CPGs") for facilities in Chester, Fairfax, Eden, and Ira, Vermont. ITW seeks to permit and construct a 140-foot wireless telecommunications facility (the "Tower") on a portion of the approximately 506-acre parcel of land owned by Matthew Hull off Bordoville Road in Enosburgh, Vermont (the "Tower Site"). The objective of this Enosburgh project (the "Project") is to interconnect this Tower Site with two previously-approved ITW sites to the south, located in Fairfax and Eden, Vermont. The goal of this network of tower sites is to provide reliable wide-area ESMR services to the northern part of Vermont and, ultimately, to provide statewide coverage by connecting existing ITW sites that provide coverage in Massachusetts and New Hampshire.

ITW undertook propagation studies using the EDX Signal software program and TIREM propagation model for ITW's ESMR network that demonstrated that there is a significant gap in coverage (the "Coverage Gap") in southwest Enosburgh and north Bakersfield, along an approximate six-mile stretch of Vermont Route 108; in Enosburgh, along secondary roads such as Chester A. Arthur Road, Bordoville Road, Jones Road, and St Pierre Road; and finally, in Bakersfield, along secondary roads such as County Road, Hennessey Road, Pudvah Hill Road, and Ovitt Road. Similarly, ITW ran propagation studies for the Coverage Gap for the National Carriers; those studies also showed a gap in cellular service in the area. (Docs. 20-3, 20-14.)

8

The Coverage Gap is both physically large (at least six miles in length along Route 108) and affects a substantial number of individuals who travel along Route 108 or reside within the Coverage Gap. Traffic count data from the Vermont Agency of Transportation indicate that the annual average daily traffic count along Route 108 was approximately 1,388 vehicle trips per day in 2022.

ITW undertook an assessment of whether existing structures within or around the Coverage Gap would be capable of providing coverage to the Coverage Gap. None existed. ITW's research confirmed that there are only two existing towers within a ten-mile radius of the proposed Tower Site, and they are too far away or not tall enough to provide the necessary coverage. The Coverage Gaps can only be remedied by the construction of a new, properly sited tower facility.

ITW began searching for sites to fill the Coverage Gap between Enosburgh, Fairfax, and Eden. During the site acquisition process, ITW examined numerous sites to assess their availability and viability. Ultimately, ITW located nine properties that appeared to be potentially suitable tower sites. Of those, the only available and viable site that ITW was able to locate was the present Tower Site off Bordoville Road; all of the other sites were not available or did not have acceptable RF coverage characteristics. Based upon the RF studies and the conditions at the Tower Site, such as ground elevation and height of the tree cover, ITW determined that a 140-foot tower height is the minimum necessary to fill the Coverage Gap for ITW's 900 MHz ESMR Network and to provide space for co-location for all the National Carriers.

## II.   PUC Proceedings

### A.   ITW's June 2022 Application

On March 4, 2022, ITW filed with the State of Vermont Public Utility Commission

("PUC") the advance notice of its intention to file an application ("60-Day Notice"), as required

by 30 V.S.A. § 248a(e).   ITW filed that Notice at least 60 days before it filed the § 248a

application.   ITW also complied with the remaining provisions of § 248a(e) by serving the 60-

Day Notice on the entities and individuals required to receive that Notice.

On June 8, 2022, ITW submitted an application ("Application") to the PUC for a CPG in

connection with the Enosburgh Project.   The Application included a petition, proposed findings,

conclusions and CPG, prefiled testimony, affidavits, exhibits, and various required certifications.

The Application described the Project as follows:

> ITW intends to construct a telecommunications facility on a portion of the approximately 506-acre parcel of land owned by Matthew Hull off of Bordoville Road in Enosburgh, Vermont.   ITW refers to the project as "Enosburgh."   The property owner has given ITW permission to proceed with this Application.   The coordinates for the Project are latitude 44°50′27.60″ North and longitude 72°48′39.42″ West.

> ITW will create an 80′ x 80′ "Compound" enclosed by an 8′ high chain link fence, with a locked gate.   Within the Compound, ITW will construct a 140′ above ground level ("AGL") telecommunications self-supporting lattice tower ("Tower").   Six (6) thin "whip" antennas ("Antennas") will be mounted at 140′ AGL of the Tower.   Five (5) transmit Antennas will extend upward to a maximum height of 153.0′ AGL.   The receive Antenna will reach downward from the 140′ AGL mounting level.   Each Antenna will measure approximately 13′ long and 2.75″ in diameter.

> ITW will place an equipment cabinet ("Cabinet") on a 10′ by 10′ concrete pad inside the Compound, to the northwest of the Tower.   The Cabinet will contain the electronics equipment necessary for the operation of the Project.

> Co-axial cables from the mounted Antennas will descend on the inside of the Tower.   The cables will exit near the base of the Tower and will connect with the Cabinets via a proposed cable bridge.

To provide access to the Compound, ITW proposes to follow an existing trail from Bordoville Road into a cleared area and then into the Compound ("Access"). The Access and utilities will run within a 25′ wide access and utility easement. Underground utilities will follow the Access from the closest existing utility connection point on Bordoville Road to the Compound and will be placed in a trench adjacent to the Access.

Approximate clearing limits are shown on the enclosed plans. The contractor will limit clearing to the minimum required to construct the Access and Compound, which is estimated to be approximately 22,256 square feet. Culverts, check dams, water bars, and silt fencing will be placed along the Access and at the Compound as indicated on the enclosed plans to control erosion both during and after construction. Construction shall meet the requirements of the State of Vermont Low Risk Site Handbook for Erosion Prevention and Sediment Control. After the completion of construction, the amount of new impervious surface will be approximately 6,724 square feet.

(Doc. 20-13 at 9–11, ¶¶ 3–8 (citations omitted).)

To show that it had explored the possibility of co-locating its facility on an existing telecommunications structure, ITW included the following passages in its Application:

The Project cannot be located on or at an existing telecommunications facility. There are no such facilities within the area to be served by ITW's Enosburgh site. In particular, ITW examined the possibility of co-locating its antennas and other equipment at the only two (2) existing towers within a 10-mile radius of the location for its Enosburgh site. Due to distance, intervening terrain and vegetation, none of those towers would meet ITW's objectives for this site.

The Route 108 corridor is a very difficult area to cover because it is a narrow, winding path that runs between mountainous terrain. That topography presents severe challenges with signal propagation. The propagation plots that Kevin Delaney created for this site illustrate these difficulties.

In particular, intervening terrain causes a sharp drop off in coverage as illustrated in those plots. Moreover, the population density is quite low, so ITW (and other carriers) seeks to provide coverage with the least number of facilities possible. The existing facilities both within the Town of Enosburgh and the surrounding towns within a radius of ten (10) miles from the proposed site do not provide adequate coverage to the area being served by this project. In fact, research of the areas confirmed that there are only (2) two existing towers within a (10) mile radius of the proposed site. Those existing towers are simply too far away or not tall enough to provide the needed [coverage].

(*Id.* at 12–13, ¶ 12 (citations omitted).)  The Application further explained that the proposed facility will be unmanned, will not generate wastewater, and will not involve on-site storage or disposal of toxic or hazardous waste.  (*Id.* ¶ 13.)

The Application included a copy of an April 13, 2022 letter from EBI Consulting to the Vermont Division for Historic Preservation summarizing the Project.  (*Id.* at 83.)  Noting that the Project was required to undergo review with the State Historic Preservation Office under Section 106 of the National Historic Preservation Act, the letter sought the Division's concurrence with the engineers' findings of "No Historic Properties in the Area of Potential Effects-Direct Effects" and "No Adverse Effect on Historic Properties in the [half-mile radius] Area of Potential Effects-Visual Effects."  (*Id.*)  The letter bears a stamp signed by Vermont State Historic Preservation Officer Laura Trieschmann and dated May 23, 2022 stating: "NO ADVERSE EFFECT."  (*Id.*)

The technical drawings included with the Application depicted the proposed structure, including antenna locations:

SPA 012



(Doc. 20-13 at 169.)  ITW's proposed 900 MHz system antennas would be mounted at 140 feet, with the transmit antennas extending upward to a height of 153 feet and the receive antenna extending downward to 127 feet.  The National Carriers would have mountings at 122.5 feet and downward in 10-foot increments.

13

The RF propagation begins to precipitously decrease when antenna arrays at the Project are installed below an elevation of 100 feet due to intervening terrain and vegetation in the area. A reduction in the height of the Tower to 120 feet would mean that only one National Carrier would be able to mount antennas above 100 feet, thereby undermining the usefulness of the Tower for co-location and requiring construction of additional towers in the Coverage Gap to fill that gap for multiple National Carriers.

**B.      Scheduling a Merits Hearing[6]**

On June 10, 2022, the PUC issued a memorandum stating that ITW's Application was "administratively complete" and assigning it Case Number 22-2120-PET. (Doc. 20-15.) The memorandum stated that "interested parties" had until July 12, 2022 to file comments, motions to intervene, and requests for hearing on the Application. (*Id.*)

On July 6, 2022, the Vermont Department of Public Service ("DPS") filed a Motion for Extension of Comment Period, to which ITW assented, seeking to extend the July 12 deadline to July 26. (Doc. 20-16.) On or before July 26, 2022, various individuals and entities submitted comments, motions to intervene, and requests for a hearing. As a result, on August 2, 2022, the PUC issued a memorandum asking that ITW file a response to those motions on or before August 12, 2022. (Doc. 20-17.) On August 12, 2022, ITW filed and served its Consolidated

---

[6] The parties do not dispute the following facts about the process of scheduling a merits hearing. All three counts in the Amended Complaint invoke the Due Process Clause (Doc. 9 ¶¶ 98, 104, 112), which might be a basis for challenging the speediness of a hearing on the merits of the Application. *See In the Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(b)*, 24 F.C.C. Rcd. 13994, 14005 (2009) ("Shot Clock Order"). But ITW's motion does not address that issue, and the Amended Complaint does not appear to seek any relief on this particular basis. The following facts therefore might be immaterial to any issue before the court, but the court includes them here for completeness.

14

Response to Public Comments and Comments Submitted by the DPS and the Northwest

Regional Planning Commission ("NRPC"). (Doc. 20-18.)

On August 19, 2022, the PUC issued a Procedural Order Granting Motions to Intervene

and Requests for Hearing. (Doc. 20-19.) The Procedural Order stated that a hearing would be

necessary but did not set the date for the hearing. On September 29, 2022, the PUC issued a

Notice of Hearing for the purpose of holding a scheduling conference on October 6, 2022 to

determine the date of the hearing on the merits of ITW's Application. (Doc. 20-20.) At the

scheduling conference, counsel for ITW suggested that the parties would be unlikely to agree on

a schedule because, in ITW's view, federal law required the PUC's proceedings to conclude by

November 7. (Doc. 20-22 at 9–10.) Later in the day on October 6, ITW filed a proposed

schedule requesting a merits hearing during the week of October 24–28, 2022. (Doc. 20-21.) On

October 20, 2022, the PUC issued a Scheduling Order setting an evidentiary hearing for

January 12, 2023. (Doc. 20-23.) The Scheduling Order did not specify when the PUC would

issue a decision on the Application.

**C.    Aesthetics Expert's December 2022 Report**

DPS's aesthetics expert Gordon Perkins issued a report entitled "Aesthetic Analysis and

Orderly Development Review" on December 12, 2022. (Doc. 20-24.) After defining a Visual

Study Area ("VSA") as "a two-mile radius around the proposed tower" (*id.* at 8), the report

presented the following graphic showing the results of a digital surface model ("DSM")

viewshed analysis:



(*Id.* at 23.)  The accompanying text stated:

> The results of the DSM viewshed analysis indicate that the tower could be visible
> from approximately 3.1% of the VSA (i.e., the tower would be entirely screened
> from 96.9% percent of the VSA).  Areas where the tower is predicted to be visible
> occur almost entirely in Rural Valley locations along State Route 108 to the north
> and east of the tower, with small, scattered areas of visibility indicated in Forest
> Upland locations.  It is worth noting that these viewshed results indicate where any
> portion of the tower may be visible, and it is possible that only a small portion of
> the tower may be visible from many locations within the tower's viewshed due to
> screening provided by intervening vegetation.  In order to provide additional
> information on the amount of tower visibility that is likely to occur, a second DSM-
> based viewshed analysis based on the tower's mid-point was conducted.  The
> results of this viewshed analysis indicate that the upper half of the tower would be
> visible from 1.4% of the VSA (i.e., from roughly half of the areas where visibility
> is predicted to occur, the bottom half of the tower will be screened by topography,
> vegetation, and/or structures).

(*Id.* at 22.)

ITW asserts that "[t]he neighboring property owners who had intervened in the PUC

Case ("Neighbors") live on or near Bordoville Road, away from State Route 108" and that

"[t]herefore, none of them would see any part of the Tower from their properties."  (Doc. 20-6

¶ 52.)  Defendants maintain that Mr. Perkins's analysis does not support that assertion.

(Doc. 29-1 ¶ 52.)  The court can take notice that Bordoville Road is located west of Route 108.

Inspection of the DSM viewshed analysis graphic also indicates that most of the calculated

visibility is along or east of Route 108.  However, the DSM graphic above also shows some

scattered locations of visibility west of Route 108, and the report also expressly states that there

is potential visibility "along portions of Bordoville Road."  (Doc. 20-24 at 24.)[7]  Drawing all

reasonable inferences in Defendants' favor, the court concludes that ITW has not shown that

none of the "Neighbors" would see any part of the Tower from their properties.

---

[7] A zoomed-in view of the DSM study shows several areas where the proposed Tower is
calculated to be visible in locations around the Bordoville Village Historic District, including
several locations abutting Bordoville Road.  (*Id.*)

### D.    January 2023 Merits Hearing

The PUC convened a videoconference evidentiary hearing on January 12, 2023. PUC Hearing Officer Gregg C. Faber presided. Attorney Brian Sullivan appeared for ITW, attorney Michael Swain appeared for DPS, and attorney L. Brooke Dingledine appeared for several of the individual intervenors. The NRPC did not participate in the merits hearing. (*See* Doc. 20-25.)

Under cross-examination by Attorney Dingledine, DPS's aesthetics expert Mr. Perkins testified regarding the possibility of reducing the proposed Tower from 140 feet to 120 feet:

> [I]n our visual impact assessment and orderly development review, we did run a view shed of the tower at 120-foot height to see whether or not it would make a substantial difference. And when compared to the 140-foot height that we ran, the difference was incremental at best. It did not substantially reduce the visibility of the tower within the visual study area. And there were no substantial reductions in the locations where the tower would be visible.

(*Id.* at 79.) Later in his testimony, Mr. Perkins similarly testified that, based on the viewshed analysis, "the mitigating effect of that height reduction was not significant in any way from areas where we thought adverse visual impact could occur" and that a 20-foot reduction in height "would not be effective in reducing the visual impacts." (*Id.* at 90–91.)

The parties disagree about how to characterize the difference in visual impact between 120-foot and 140-foot structures. ITW asserts that a height reduction to 120 feet "would not be effective in reducing visual impacts." (Doc. 20-6 ¶ 56.) Defendants maintain that there would be a difference in visual impact if the Tower were 120 feet tall, noting that Mr. Perkins's report indicates that a 140-foot tower could be visible from approximately 3.1% of the VSA while a 120-foot tower could be visible from only about 2.5% of the VSA. (Doc. 29-1 ¶ 55; *see also* Doc. 20-24 at 22, 31.) Regardless of the dispute about how to describe the difference in words, there appears to be no dispute over the following DSM viewshed graphic comparing visibility of 120-foot and 140-foot structures:

18

SPA 018



(Doc. 20-24 at 32.)

The Hearing Officer also admitted into the record prefiled testimony and exhibits from ITW's engineer Louis Hodgetts. (Doc. 20-25 at 43.) The exhibits included photographic simulations of the Tower's visibility from 11 different viewpoints. (Doc. 20-13 at 85–100.) On cross-examination by Attorney Dingledine, Mr. Hodgetts opined that, although he was not an RF expert, reducing the tower by 20 feet would not be a reasonable mitigation method because "it would significantly limit the ability for future collocation and reduce the coverage" of ITW's ESMR 900 MHz service. (Doc. 20-25 at 58.)

### E.    February 2023 Proposal for Decision, NRPC Comments, and Remand

On February 28, 2023, after post-merits hearing briefing, the Hearing Officer issued a Proposal for Decision ("First PFD") recommending that the PUC approve ITW's Application. (Doc. 20-26.) On March 30, 2023, the Hearing Officer signed an "Order Requesting Clarification" seeking clarification from the NRPC "as to what, if any, recommendations the NRPC has with respect to the proposed facility's compliance with the regional plan." (Doc. 20-27.) On April 24, 2023, the PUC issued a "Notice of Hearing" setting an oral argument to take place on May 4, 2023 on unspecified matters relating to the Application. (Doc. 20-28.)

On April 28, 2023, the NRPC submitted its Project Review Committee's ("PRC") comments to the PUC. (Doc. 20-32.) The PRC stated, among other things, that the Project "is not in conformance with the [Northwest Regional Plan[8]] due to the height of the tower" and that "[t]he project's height is not compatible with the scenic rural character of the Bordoville hamlet

---

[8] Vermont law requires each regional planning commission to "[p]repare a regional plan." 24 V.S.A. § 4345a(5). The regional plan at issue in this case is the Northwest Regional Plan (the "Regional Plan"). The current version of the plan became effective on August 30, 2023. Northwest Regional Plan 2023–2031, https://www.nrpcvt.com/wp-content/uploads/2023/10/ADOPTED_RegionalPlan_2023_August30.pdf [https://perma.cc/Z4Y8-NJEP]. The Regional Plan at the times relevant to this case would presumably have been the version immediately preceding the current version.

and has a negative impact on the area's historic resources, such as the Bordoville Seven[th] Day

Adventist Church." (Doc. 20-32 at 2–3.)  According to the PRC's April 2023 letter:

> As stated in Goal 3 and Policy 4b of the Economic Infrastructure chapter of the
> Regional Plan, telecommunications infrastructure must be "the least obtrusive
> system" and shall be "sited in the least obtrusive and least ecologically sensitive
> areas possible."  The tower is not the least obtrusive possible system to provide the
> applicant's service due to its height.  As shown in the permit drawings, the tower
> has co-location opportunities for 5 panel antennas, despite the applicant's service
> requiring only whip antennas.  While the Regional Plan supports co-location, it
> does not support building a significantly taller and more obtrusive tower than
> necessary when the applicant has not provided evidence that there will be co-
> located panel antenna services on the tower.

(*Id.* at 3.)  The PRC had presented substantially similar statements in an earlier set of comments

dated July 26, 2022.  (*See* Doc. 20-30.)

But the PRC's April 2023 letter included a topic that was not mentioned in the July 2022

letter:

> The Committee notes that as stated in the letter from the St. Albans Police
> Department dated August 8, 2022, co-location for emergency services is to be
> provided on the tower.  However, the Committee fails to find how this co-location
> justifies the height of the tower as the letter does not specify a specific height which
> is necessary for expanding emergency radio services.  Additionally, emergency
> radio services generally do not require panel antennas, and would not occupy one
> of the five proposed locations for co-located panel antennas.

(Doc. 20-32 at 3.)  Also on April 28, 2023—the same day as the date of the PRC's letter—the

PUC canceled the hearing that it had previously noticed for May 4, 2023.  (Doc. 20-34.)

In an Order dated May 3, 2023, the PUC remanded the case to the Hearing Officer.  The

PUC cited the NRPC's April 28, 2023 letter and stated: "In light of this clarification, the

Vermont Public Utility Commission has decided to reopen the evidentiary record in this case and

remand the case to the Hearing Officer for any further process associated with this document."

(Doc. 20-35.)

**F.    July 2023 Revised Proposal for Decision**

In an Order dated May 4, 2023, the Hearing Officer requested the parties' responses to the NRPC's April 2023 comments. (Doc. 20-36.) ITW submitted comments on May 26, 2023. (Doc. 20-37.) In those comments, ITW referenced St. Albans Police Chief Maurice Lamothe's August 8, 2022 letter stating that the Tower would improve public safety communications in several areas of the community and that "[w]e would want to install our equipment at the top, 140 feet, of the tower to get the best results for emergency dispatching." (Doc. 20-14 at 9.) ITW also represented that, after reviewing NRPC's April 2023 comments, the St. Albans Police Department "reiterated its desire to have its antenna located at 140′ above ground level." (Doc. 20-37 at 7.)

On July 6, 2023, the Hearing Officer issued a Revised Proposal for Decision ("Second PFD"), recommending that the PUC deny ITW's Application. (Doc. 20-38.) The Hearing Officer wrote that he recommended denial "in light of additional information received" after the First PFD. (*Id.* at 2 n.1.) He reasoned in part:

> I agree with both the Petitioner and the Department that the construction of telecommunications facilities that include collocation space is consistent with the State's interests pursuant to § 202c and the public good in general. I also agree with the Petitioner that the NRPC's position in this case has been far from clear and that the case would have benefitted from greater participation on the part of the NRPC. However, I conclude that the NRPC's request for some evidentiary showing on the part of the developer that the extra tower height is necessary to build the facility, and that the extra collocation space will result in services that the surrounding community may benefit from, is reasonable.

(*Id.* at 7.) The Hearing Officer further stated:

> The Petitioner has submitted evidence that lowering the height of the Project tower would compromise potential collocation opportunities. However, there is no evidence to demonstrate that those collocation opportunities will ever be used or that, even if collocation were to occur, that it would result in benefits to the surrounding community. The Petitioner's testimony at the evidentiary hearing suggests that a height of 120′ could still meet at least some of the Project's goals. In addition, the NRPC's recommendations here do not amount to a blanket

prohibition on the construction of telecommunications facilities in the region. As the Petitioner points out, the NRPC has not raised opposition to other similar facilities in the region. The Project will further the State's goals in providing universal access to wireless telecommunications services pursuant to § 202c. However, because these goals could, at least in part, be achieved with a lower tower height, I do not find this sufficient good cause to reject the NRPC's recommendation in support of a less obtrusive facility. Accordingly, I recommend that the Project application be denied on the grounds that it is not consistent with the Regional Plan, with substantial deference accorded to the recommendation of the NRPC pursuant to § 248a(c)(2).

(*Id.* at 7–8 (footnotes omitted).)  Regarding DPS's recommendation to collect additional evidence on lowering the Tower height, the Hearing Officer found that "inappropriate at this point in the proceedings given that the Petitioner is not seeking a CPG for a 120-foot tower" but indicated that the Department should "explore this issue with the Petitioner, should the Petitioner decide to submit an application consistent with the Regional Plan in the future." (*Id.* at 8.)

ITW filed objections to the Second PFD on July 21, 2023.  (Doc. 20-39.)  ITW argued that:

- The NRPC conceded that the Project will not have a substantial regional impact;

- The Neighbors (a/k/a "Intervenors") will not be able to see the Tower portion of the Project, or its ground facilities, at all;

- ITW demonstrated that its chosen 140′ tower height is necessary for meaningful co-location of commercial carriers to serve the area in question; and

- The Police Department stated its preference to locate its public service antenna at the top of the 140′ Tower.

(*See id.*; *see also* Doc. 20-6 ¶ 72.)

## G.   August 2023 Denial Order

The PUC adopted the Second PFD in an Order Denying Certificate of Public Good dated August 3, 2023.  (Doc. 20-40.)  The PUC's Order stated, in pertinent part:

23

> We agree with [ITW] and the [DPS] that the construction of telecommunications facilities is, in general, consistent with the State's broad interests pursuant to § 202c and the public good in general. However, we conclude that these interests could, at least in part, be served with a shorter and less obtrusive tower as recommended by the NRPC.

(*Id.* at 9–10.) The Order elaborated: "[G]iven the specificity of the NRPC's narrow recommendations, we agree with the Hearing Officer that there is not sufficient good cause to reject the NRPC's recommendations in this case." (*Id.* at 10.)

## III.    This Federal Suit

ITW did not appeal the PUC's August 2023 Order under 30 V.S.A. §§ 12 and 234. Instead, ITW exercised its right to seek review in this court under 47 U.S.C. § 332(c)(7)(B)(v). ITW filed its original Complaint in this federal action on August 31, 2023. (Doc. 1.)

## Analysis

ITW's Amended Complaint contains three counts: (1) violation of the TCA for lack of substantial evidence to support the PUC's denial (the "Substantial Evidence Claim"); (2) violation of the TCA by "effective prohibition" of personal wireless services offered by ITW and National Carriers (the "Effective Prohibition Claim"); and (3) a count seeking declaratory judgment (the "Declaratory Judgment Claim") that the "substantial deference" provision of 30 V.S.A. § 248a violates the "substantial evidence" requirement of the TCA at 47 U.S.C. § 332(c)(7)(B)(iii). (*See* Doc. 9.) Defendants seek judgment in their favor on each of those counts. (Doc. 12.) ITW seeks judgment in its favor on each of the three counts. (Doc. 20.)

## I.    Substantial Evidence Claim (Count I)

The parties do not dispute the applicability of the TCA's "substantial evidence" standard. Under 47 U.S.C. § 332(c)(7)(B)(iii): "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

24

Although Defendants challenge Mr. Umano's statement that land mobile communications services (such as ITW's ESMR 900 MHz service) are "personal wireless services" (Doc. 29-1 ¶ 5), Defendants have already conceded that "SMR is a type of personal wireless service." (Doc. 12 at 9.)[9]  The TCA's "substantial evidence" standard applies to the PUC's August 2023 Denial Order.

The parties also do not dispute the requirements of the TCA's "substantial evidence" standard.  "Whether a decision is supported by substantial evidence must be determined according to 'the traditional standard used for judicial review of agency actions.'" *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 638 (2d Cir. 1999) (quoting *Cellular Tel. Co v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999)); *see also Indep. Wireless One Corp. v. Town of Charlotte*, 242 F. Supp. 2d 409, 414 (D. Vt. 2003) [hereinafter "*IWO*"].  "Substantial evidence requires evaluation of the entire record, including opposing evidence . . ., and requires a decision to be supported by 'less than a preponderance but more than a scintilla of evidence.'" *Sprint*, 176 F.3d at 638 (quoting *Cellular Tel. Co.*, 166 F.3d at 494).

This standard of review is deferential.[10]  *Cellular Tel. Co.*, 166 F.3d at 494.  The court is not permitted to engage in its own fact-finding or to "supplant the [PUC's] reasonable

---

[9] This is consistent with the statutory definitions of "personal wireless services" and "personal wireless service facilities" at 47 U.S.C. § 332(c)(7)(C).  Notably, the cellular service that would be provided by a National Carrier would also qualify as a "personal wireless service." *See N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 603 F. Supp. 2d 715, 725 n.13 (S.D.N.Y. 2009) ("For purposes of the Telecommunications Act, personal communications services fall within the larger class of personal wireless services.").  The distinction between "personal wireless" and "personal communications" service does not impact the applicability of the relevant TCA provisions in this case.

[10] The Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024), discusses the deference that agencies previously enjoyed under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), when interpretating the statutes that the agencies administer.  *Loper* overruled *Chevron* but does not appear to affect "judicial review of agency policymaking and factfinding."  *Loper*, 144 S.Ct. at 2261.  Because

determinations." *Id.* Still, review under the "substantial evidence" standard is more demanding

than the "rational basis" review standard. *IWO*, 242 F. Supp. 2d at 414. "When evaluating the

evidence, local and state zoning laws govern the weight to be given the evidence." *Cellular Tel.*

*Co.*, 166 F.3d at 494. The TCA "establishes procedural requirements that local boards must

comply with in evaluating cell site applications." *Id.* But the TCA generally does not "affect or

encroach upon the substantive standards to be applied under established principles of state and

local law." *Id.* (quoting *Cellular Tel. Co. v. Zoning Bd. of Adjustment*, 24 F. Supp. 2d 359, 366

(D.N.J. 1998)).[11]

Under Vermont law, the PUC may grant a CPG for the construction or installation of

telecommunications facilities "if it finds that the facilities will promote the general good of the

State consistent with [30 V.S.A. § 202c(b)]." 30 V.S.A. § 248a(a). Before issuing a CPG under

§ 248a, the PUC must find that, among other things, "[t]he proposed facility will not have an

undue adverse effect on aesthetics, historic sites, air and water purity, the natural environment,

and the public health and safety" and that, if it relates to the provision of wireless service, "the

proposed facility reasonably cannot be colocated on or at an existing telecommunications

facility, or such colocation would cause an undue adverse effect on aesthetics." *Id.* § 248a(c)(1),

(3).

---

Count I primarily concerns agency factfinding and does not involve any agency's interpretation of a statute, *Loper* does not appear to impact the analysis here.

[11] The TCA does impose some substantive limitations, including the proviso that the "[d]ecisions of local zoning boards may not 'prohibit or have the effect of prohibiting the provision of personal wireless services.'" *Indep. Wireless One*, 242 F. Supp. 2d at 414 (quoting 42 U.S.C. § 332(c)(7)(B)(i)(II)). The court considers that substantive limitation in its analysis of Count II, below.

## A.     Burden-Shifting

ITW argues that, because it has shown that it made a good-faith effort to evaluate alternative sites, "the burden shifts to Defendants to demonstrate that there is substantial evidence in the record that a more feasible site exists to remedy the coverage gap." (Doc. 18 at 10; *see also* Doc. 20 at 9.)  And ITW asserts that there is no such evidence. (Doc. 18 at 11; Doc. 20 at 10.)  Defendants maintain that "no burden shifting has occurred because Plaintiff has not made a good faith effort to evaluate alternative sites like a shorter tower." (Doc. 19 at 3.)

The court is not persuaded that a shorter tower would constitute an alternative "site."  But Defendants also assert that "the Denial Order is not based on the existence or nonexistence of an alternative site for the Tower." (Doc. 29 at 9.)  Defendants point out that the PUC's August 2023 Denial Order did not discuss the issue of alternative sites.  The court agrees with Defendants on this issue.

The possibility of alternative sites is relevant to the issues of aesthetics enumerated at 30 V.S.A. § 248a(c)(1) and (3).  *See, e.g.*, *Petition of New Cingular Wireless PCS, LLC*, No. 7998, 2013 WL 871477, at *4 (Vt. Pub. Serv. Bd. Mar. 4, 2013) (discussing alternative locations for proposed telecommunications facility as part of aesthetics discussion); *see also In re Rutland Renewable Energy, LLC*, 2016 VT 50, ¶ 56 n.11, 202 Vt. 59, 147 A.3d 621 (Reiber, C.J., dissenting) (noting that alternative sites are "appropriate for consideration in CPG proceedings").  Alternative sites could also potentially be relevant if raised as part of the recommendations of a municipal planning commission under 30 V.S.A. § 248a(c)(2).

In this case, however, it does not appear from the record that the NRPC ever raised the issue of possible alternative sites.  The NRPC's position was that the Project did not conform to the Regional Plan "due to the height of the tower." (Doc. 20-32 at 2.)  The NRPC did not

otherwise assert an objection to the location of the Tower.  In this litigation, the parties do not dispute that ITW examined numerous potential sites and that the Bordoville Road site was "the only available and viable site that ITW was able to locate."  (Doc. 20-6 ¶¶ 32–33.)  If there ever was a dispute about the possibility of alternative sites, the court has not found it in the record.

Thus—even assuming (without deciding) that ITW is correct about a burden-shifting procedure for the analysis of alternative sites[12]—that framework is not applicable here.  The absence of a burden-shifting analysis on the issue of alternative sites does not prove that the PUC's Denial Order was unsupported by substantial evidence.

### B.    Evidence for the Denial Order

Apart from its contention regarding burden-shifting, ITW asserts that "there was *no* evidence for the Denial Order."  (Doc. 20 at 8.)  ITW maintains that it demonstrated "that a Coverage Gap exists, that there is a need for improved service in the Coverage Gap, and that the proposed Tower would remedy the situation" and further demonstrated "that the proposed Tower is the only feasible and least obtrusive alternative to fill the Coverage Gap."  (*Id.* at 9.)  Defendants contend that the Denial Order articulates multiple reasons for the denial and that each of those reasons is supported by substantial evidence.  (Doc. 29 at 9–12.)  In reply, ITW argues

---

[12] The authorities that ITW cites for its burden-shifting theory involve application of New York law's "public necessity" standard, not Vermont's "general good of the State" standard under 30 V.S.A. § 248a(a).  *See Crown Castle Fiber LLC v. Town of Oyster Bay*, No. 21-CV-6305, 2024 WL 1051171 (E.D.N.Y. Jan. 19, 2024), *report and recommendation adopted*, 2024 WL 1090305 (E.D.N.Y. Mar. 13, 2024); *Up State Tower Co. v. Town of Tonawanda*, No. 19-CV-00952, 2020 WL 8083693, at *13 (W.D.N.Y. Nov. 18, 2020), *report and recommendation adopted*, 2021 WL 50906 (W.D.N.Y. Jan. 6, 2021), and *New York SMSA Limited Partnership v. Incorporated Village of Mineola*, No. 01-CV-8211, 2003 WL 25787525, at *9 (E.D.N.Y. Mar. 26, 2003).  Nor is it clear that those decisions actually employed the burden-shifting framework upon which ITW relies.

28

that the NRPC's opinion cannot outweigh the "substantial evidence that ITW and the [DPS]

adduced." (Doc. 32 at 3.)

The court agrees that the record contains significant evidence regarding aesthetics and

regarding the performance of the radio equipment on the proposed 140-foot Tower and on a 120-

foot version. And that evidence might even amount to "substantial" evidence that could support

a conclusion that, when compared to a 140-foot tower, a 120-foot tower would provide

significantly less RF coverage while having only have a marginally lesser impact on aesthetics.

But as the Second Circuit has observed in other contexts involving a "substantial evidence"

standard, "whether there is substantial evidence supporting the [plaintiff's] view is not the

question here; rather, [the court] must decide whether substantial evidence supports *the [PUC's]*

*decision.*" *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order).

On that issue, the court has no difficulty concluding that substantial evidence supports the

PUC's August 2023 Denial Order. The PUC stated in that order:

> We agree with [ITW] and the [DPS] that the construction of telecommunications
> facilities is, in general, consistent with the State's broad interests pursuant to § 202c
> and the public good in general. However, we conclude that these interests could,
> at least in part, be served with a shorter and less obtrusive tower as recommended
> by the NRPC.

(Doc. 20-40 at 9–10.) The PUC further stated: "The recommendations of the NRPC are

reasonable and specific to this particular tower." (*Id.* at 10.) And the PUC declined to accept

"the notion that [30 V.S.A.] § 202c always preempts the recommendations of town or regional

planning commissions" because doing so would "render[] the substantial deference standard

found in § 248a(c)(2) virtually meaningless." (*Id.*)

For the reasons discussed below, the "substantial evidence" requirement at 47 U.S.C.

§ 332(c)(7)(B)(iii) does not preempt the "substantial deference" standard at 30 V.S.A.

§ 248a(c)(2). *See infra* Part III.[13] Following § 248a(c)(2)'s directive to give "substantial

deference" to the recommendations of the regional planning commission concerning the regional

plan, the PUC considered the requirements of the Northwest Regional Plan—including the

Regional Plan's goal that telecommunications infrastructure be "the least obtrusive system

possible" and the policies that new telecommunications infrastructure be "sited in the least

obtrusive and least ecologically sensitive areas possible" and that it "fit within the character of

the area." (Doc. 20-32 at 2.) The PUC also considered the NRPC's letter opining that "[t]he

project is not in conformance with the plan due to the height of the tower." (*Id.*)

The evidence before the PUC showed that a 120-foot tower would be visible from fewer

locations than a 140-foot tower. (*See* Doc. 20-24 at 32.) As noted above, the parties dispute how

to characterize this difference and whether it is a significant difference. Nevertheless, the

differences in visibility between the 120-foot and 140-foot versions support the PUC's

conclusion that a 120-foot structure would be "less obtrusive" than the proposed 140-foot Tower.

(Doc. 20-40 at 10.)

At the same time, the PUC recognized that the State of Vermont has "broad interests"

that include the construction of telecommunications facilities. (*Id.* at 9.) Substantial evidence

supports the PUC's conclusion that those interests could be served "at least in part" with a 120-

foot tower. (*Id.* at 9–10.) Mr. Delaney testified that a 120-foot tower "would work" for ITW's

---

[13] Defendants assert that if the PUC's Denial Order is based on "substantial evidence," then it is unnecessary to address the preemption argument in Count III of ITW's Amended Complaint. (Doc. 12 at 12–13.) But the Denial Order is based on an application of § 248a(c)(2)'s "substantial deference" standard. The court is not persuaded that it can evaluate whether "substantial evidence" supports the PUC's decision without recognizing that the PUC was applying § 248a(c)(2)'s "substantial deference" standard. The court accordingly analyzes the parties' competing motions as to Count III below.

ESMR 900 MHz system. (Doc. 20-25 at 33.)[14] As for the clusters of antennas that cellular

carriers could use for their service, Mr. Delaney testified that a 120-foot tower could support one

fewer carrier than the five depicted on the elevation drawing for the proposed 140-foot structure.

(*Id.* at 38.) He further opined that the two lowest locations on a 120-foot tower would be

"unlikely" to attract a cellular carrier, but he conceded that "[u]nlikely doesn't mean it won't

be." (*Id.* at 40.) This evidence supports the PUC's conclusion that a 120-foot structure would

serve the State's telecommunications interests "at least in part."

In sum, the evidence before the PUC illustrated a tradeoff between aesthetics and RF

performance depending on whether the proposed structure is 120 feet or 140 feet. Granting

"substantial deference" to the NRPC's comments under 30 V.S.A. § 248a(c)(2), the PUC found

insufficient "good cause to reject the NRPC's recommendations" and denied ITW's Application

for a 140-foot tower. (Doc. 20-40 at 10–11.) The court concludes that substantial evidence

supports the PUC's decision for the reasons stated above.

## II.     Effective Prohibition Claim (Count II)

Count II is a claim that the PUC's August 2023 Denial Order violates 47 U.S.C.

§ 332(c)(7)(B)(i), which states in pertinent part: "The regulation of the placement, construction,

and modification of personal wireless service facilities by any State or local government or

instrumentality thereof . . . (II) shall not prohibit or have the effect of prohibiting the provision of

personal wireless services." ITW contends that the undisputed material facts show that the

PUC's Denial Order violates § 332(c)(7)(B)(i)(II)'s mandate. (Doc. 20 at 10.) Defendants

oppose that argument (*see* Doc. 29 at 12) and seek judgment in their favor on Count II

---

[14] Mr. Delaney also testified that if the tower were only 100 feet tall, that would result in a "much more drastic change" and the coverage of ITW's ESMR system would "not [be] good enough." (*Id.* at 34.)

"[b]ecause the proposed Facility is not the least intrusive means to close a gap in coverage."
(Doc. 12 at 12.)[15]

The Second Circuit has explained that "[t]he TCA's 'ban on prohibiting personal wireless services precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines.'" *Orange Cnty.-Cnty. Poughkeepsie Ltd. P'Ship v. Town of E. Fishkill*, 632 F. App'x 1, 2 (2d Cir. 2015) (summary order) (quoting *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999)). "A plaintiff will prevail on an effective prohibition claim, therefore, 'if it shows both that a significant gap exists in wireless coverage and that its proposed facility is the least intrusive means to close that gap.'" *Id.* (quoting *T-Mobile Ne. LLC v. Town of Ramapo*, 701 F. Supp. 2d 446, 456 (S.D.N.Y. 2009)).[16]

## A. "Significant Gap" in Wireless Coverage

In opposition to ITW's motion, Defendants are content to assume that a "significant gap" in coverage exists. (Doc. 29 at 12.) In their own motion, Defendants go so far as to say that they "do not dispute that there is likely a significant gap in coverage in the area where Plaintiff

---

[15] Defendants also argue that ITW failed to show that the Facility "independently provides personal wireless service." (*Id.*) But as noted above, the distinction between "personal wireless" and "personal communications" service does not impact the applicability of the relevant TCA provisions in this case.

[16] There is no dispute that this is ITW's burden. But as to the standard of review, ITW cites cases—most from outside the Second Circuit—for the proposition that effective-prohibition claims are reviewed de novo. (Doc. 18 at 12; Doc. 20 at 11; Doc. 32 at 5.) Citing *IWO*, Defendants disagree on that point. (Doc. 19 at 5.) The court recognizes that, unlike 42 U.S.C. § 332(c)(7)(B)(iii), section 332(c)(7)(B)(i) does not mention "substantial evidence." On the other hand, this court stated in *IWO* that—without drawing any distinction between types of TCA claims—"decisions that are subject to the TCA are reviewed under the . . . substantial evidence standard." *IWO*, 242 F. Supp. 2d at 414. Ultimately the court need not decide this question because the court's conclusion on Count II is the same under either a "de novo" or "substantial evidence" standard.

proposed to site the Facility." (Doc. 12 at 9.)  Either way, this element of ITW's effective-prohibition claim does not appear to be at issue.[17]

### B.    Least Intrusive Means to Close the Gap

ITW argues that the record shows that the 140-foot Tower proposed in the Application is the "least intrusive means" to fill the gap in coverage.  (Doc. 20 at 7, 12.)  Defendants maintain that the design proposed in ITW's Application was "not the least intrusive means" for closing the gap in wireless coverage.  (Doc. 12 at 2, 12; Doc. 29 at 12.)  The court agrees with Defendants and concludes that they are entitled to judgment in their favor on Count II.

As discussed above, the parties dispute how to characterize the intrusiveness (or obtrusiveness) of a 140-foot tower versus a 120-foot tower.[18]  However, the record does not support ITW's contentions that a 140-foot tower "will not be obtrusive at all" (Doc. 20 at 5) or that "a height reduction to 120 feet would not make the Tower less visible" (Doc. 32 at 6).  As stated above, ITW has not shown that none of the "Neighbors" would see any part of the 140-foot Tower from their properties.  More generally, the evidence shows that there are differences in visibility between the 120-foot and 140-foot structures and that a 120-foot structure would be at least somewhat "less obtrusive" than the proposed 140-foot Tower.  (*See* Doc. 20-24 at 32.)

---

[17] As to whether a gap "must be determined from the perspective of a cell phone customer or from the perspective of the provider," courts have given *Chevron* deference to the FCC's interpretation of 47 U.S.C. § 332(c)(7) rejecting the "user-based approach." *Up State Tower Co. v. Village of Lakewood*, 431 F. Supp. 3d 157, 172 (W.D.N.Y. 2020) (citing *In the Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(b)*, 24 F.C.C. Rcd. 13994, 14017 (2009)).  As noted above, *Loper Bright* overruled *Chevron*. However, it is unnecessary here to determine the impact that *Loper Bright* might have on the applicable perspective for determining a "significant gap" in wireless coverage because there appears to be no question that such a gap is present in this case.

[18] Defendants suggest that the least "obtrusive" solution is necessarily also the least "intrusive" solution.  (Doc. 29 at 2 n.1.)  ITW similarly equates "obtrusive" and "intrusive." (Doc. 32 at 4.)

For the reasons discussed above, a 120-foot tower could accommodate ITW's ESMR 900 MHz system and at least a subset of the National Carriers. And the Denial Order expressly contemplates that ITW could submit an application for a 120-foot structure. (Doc. 20-40 at 8.) No "substantial evidence" supports ITW's contention that the PUC's Denial Order prohibits or has the effect of prohibiting the provision of personal wireless services. The court would reach the same conclusion under a "de novo" standard.

ITW relies on the statement in *Up State Tower Co. v. Village of Lakewood* that "[t]o deny a siting application on aesthetic grounds, there must be substantial evidence: (1) that 'residents will be able even to see the antenna[s]' and (2) there will be an actual 'negative visual impact on the community.'" 431 F. Supp. 3d 157, 173–74 (W.D.N.Y. 2020) (quoting *T-Mobile Ne. LLC v. Town of Islip*, 893 F. Supp. 2d 338, 358 (E.D.N.Y. 2012)).[19] ITW asserts that there is no evidence for either prong. (Doc. 20 at 13.) Defendants maintain that the cited test in *Lakewood* is inapplicable because the PUC's Denial Order was not "based on aesthetics grounds under 30 V.S.A. § 248a(c)(1)" but instead on the "substantial deference" standard under § 248a(c)(2). (Doc. 19 at 6.)

The court is not convinced that the "substantial deference" consideration under § 248a(c)(2) necessarily excludes any consideration of aesthetics that might inform or appear in the "recommendations" of a planning commission. In any event, the court disagrees with ITW's contention that the record lacks evidence to support the two *Lakewood* prongs. The DSM viewshed analysis shows that a 140-foot tower would be visible to residents traveling along the Route 108 corridor and from some locations west of the Tower, including along Bordoville Road

---

[19] "Antennae" in original. The better plural term in the context of radio equipment is "antennas."

SPA 034

and from some areas of the Bordoville Village Historic District. (Doc. 20-24 at 24, 32.) The

same evidence constitutes "substantial evidence" that a 140-foot tower would have a "negative

visual impact on the community."

## III.   Declaratory Judgment/Preemption Claim (Count III)

Finally, in Count III, ITW seeks a declaratory judgment that the "substantial deference"

provision of 30 V.S.A. § 248a(c)(2)—on its face and as applied in this case—violates the TCA's

"substantial evidence" requirement at 47 U.S.C. § 332(c)(7)(B)(iii) and is preempted by that

federal statute. (Doc. 9 ¶ 118.) In ITW's view—repeated throughout its papers:

> The fundamental and fatal problem with Section 248a(c)(2)'s "substantial
> deference" requirement is that it creates situations where—as here—the PUC
> denies a CPG to a tower applicant despite the absence of substantial evidence
> justifying the denial. Put differently, the "substantial deference" requirement
> unduly elevates unsupported aesthetics 'opinion' testimony above actual and
> uncontroverted third-party expert evidence that a proposed tower would have a
> minimal aesthetics impact.

(Doc. 18 at 16; Doc. 20 at 15; Doc. 32 at 9–10.) Defendants maintain that there is no conflict

between 30 V.S.A. § 248a(c)(2) and 47 U.S.C. § 332(c)(7)(B)(iii) and therefore no preemption.

(Doc. 12 at 12–15; Doc. 29 at 14–17.) Here, for the reasons discussed above, there is no

"absence of substantial evidence" to support the PUC's August 2023 Denial Order. As to ITW's

facial challenge, the court concludes that, for the reasons below, Defendants are entitled to

summary judgment on ITW's preemption claim.

"The doctrine of federal preemption provides that '[u]nder the Supremacy Clause of the

Constitution, state and local laws that conflict with federal law are without effect.'" *Williams v.*

*Marinelli*, 987 F.3d 188, 198 (2d Cir. 2021) (alteration in original) (quoting *N.Y. SMSA Ltd.*

*P'ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010) (per curiam)). The Second

Circuit has described three general types of preemption:

## SPA 035

> (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict [or "obstacle"] preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

*Id.* (quoting *SMSA*, 612 F.3d at 104). Here, ITW does not appear to rely on express or field preemption, so the court considers only the question of obstacle preemption.

"In order to establish obstacle preemption, the party asserting preemption must show more than the 'mere fact of tension between federal and state law.'" *Id.* (quoting *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006)). "Rather, there must be a 'sharp' conflict between state law and federal policy." *Id.* "[F]ederal law does not preempt state law under obstacle preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Id.* at 188–89 (alteration in original) (quoting *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 102 (2d Cir. 2013)).

Even with the benefit of all reasonable inferences, ITW has failed to make this showing. Granting "substantial deference" to the plans and recommendations of the affected municipalities and planning commissions as required by 30 V.S.A. § 248a(c)(2) is not in "direct and positive" conflict with 47 U.S.C. § 332(c)(7)(B)(iii)'s requirement that a state government's denial be "supported by substantial evidence." ITW has cited several authorities for the proposition that denial of an application for a wireless communications facility on aesthetics grounds "must be based on more than just unsupported opinion." *New Cingular Wireless PCS, LLC v. Town of Fenton*, 843 F. Supp. 2d 236, 252 (N.D.N.Y. 2012).

On the issue of aesthetics in TCA cases, "courts tend to require objective evidence of a negative visual impact that is 'grounded in the facts of the case.'" *Town of Islip*, 893 F. Supp. 2d

36

at 359 (quoting *Sw. Bell Mobile Sys. v. Todd*, 244 F.3d 51, 61 (1st Cir. 2001)).  But that does not

mean that only aesthetics experts like Mr. Perkins can supply probative evidence.  To the

contrary, objective evidence of a negative visual impact "can be established through 'aesthetic

objections raised by neighbors who know the local terrain and the sightlines of their own

homes.'" *Id.* (quoting *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 534

(2d Cir. 2005)).  Similarly, the court has no difficulty concluding that the "recommendations" of

a regional planning commission—a body composed of representatives from the region whose

duties require substantial knowledge and judgment on land-use and development issues[20]—can

qualify as objective evidence.

This conclusion does not mean that a regional planning commission's recommendations,

standing alone, qualify as "substantial evidence" in every case.  If the recommendations are not

grounded in the facts of the case or are entirely conclusory, then the PUC might find "good

cause" not to give substantial deference (or any deference) to those recommendations.  30 V.S.A.

§ 248a(c)(2).  But where a regional planning commission's recommendations are properly

entitled to substantial deference, they can form a part of the "substantial evidence" that is

required under 47 U.S.C. § 332(c)(7)(B)(iii).  The court concludes that ITW cannot meet its

burden to show obstacle preemption and that Defendants are entitled to judgment on Count III.

### Conclusion

Defendants' October 2023 Motion to Dismiss (Doc. 8) is MOOT.

Defendants' Motion to Correct Reply (Doc. 22) is GRANTED.

Defendants' December 2023 Amended Motion to Dismiss (Doc. 12) is converted to a

motion for summary judgment and is GRANTED.

---

[20] *See* 24 V.S.A. §§ 4342 (membership), 4345a (duties).

Plaintiff's Motion for Summary Judgment (Doc. 20) is DENIED.

Dated at Burlington, in the District of Vermont, this 19th day of August, 2024.

/s/ Geoffrey W. Crawford
Judge, U.S. District Court

SPA 038

# UNITED STATES DISTRICT COURT

for the
District of Vermont

Industrial Tower and Wireless, LLC

|                    | )   |
| ------------------ | --- |
| *Plaintiff(s)*     | )   |
|                    | )   |
| v.                 | )   |
|                    | )   |
|                    | )   |

Civil Action No.   2:23-cv-00365

Anthony Z. Roisman, *as a member of the State of Vermont Public Utility Commission*; Margaret Cheney, *as a member of the State of Vermont Public Utility Commission*; Riley Allen, *as a member of the State of Vermont Public Utility Commission*

*Defendant(s)*

# JUDGMENT IN A CIVIL ACTION

☐   **Jury Verdict.**

☑   **Decision by Court.**

**IT IS ORDERED AND ADJUDGED** that pursuant to the Court's Opinion and Order (Document No. 37) filed August 19, 2024, Defendants' Amended Motion to Dismiss Plaintiff's Amended Complaint (Document No. 12) is converted to a Motion for Summary Judgment and is GRANTED. JUDGMENT is hereby entered for Defendants Riley Allen, Margaret Cheney, and Anthony Z. Roisman, against plaintiff Industrial Tower and Wireless, LLC.

Date:August 21, 2024

JUDGMENT ENTERED ON DOCKET
DATE ENTERED:   8/21/2024

*JEFFREY S. EATON*
*CLERK OF COURT*

*/s/ Sharrah J. LeClair*
Signature of Clerk or Deputy Clerk